83 So.2d 340

**Richard JORDAN**

v.

**Mrs. E. E. WILSON.**

**Jack JORDAN**

v.

**Mrs. E. E. WILSON.**

**6 Div. 897, 898.**

Supreme Court of Alabama.

Nov. 10, 1955.

Kingman C. Shelburne, Birmingham, for appellants.

Huey, Stone & Patton and Bumgardner & Hawkins, Bessemer, for appellee.

STAKELY, Justice.

Richard Jordan and Jack Jordan each brought suit in the lower court against Mrs. E. E. Wilson for alleged malicious prosecution. The suits were consolidated for trial in the lower court and the appeals here are on one record from the judgments in the aforesaid cases which were in favor of Mrs. E. E. Wilson (appellee).

The complaints in each case are identical and claim damages of the defendant "for maliciously and without probable cause therefor, causing the plaintiff to be arrested under a warrant issued by Fred Ross, City Recorder, on the 1st day of April, 1948, on a charge of disorderly conduct, which charge before the commencement of this action has been judicially investigated and said prosecution ended and the plaintiff discharged."

Richard Jordan and Jack Jordan (appellants) were both tried and convicted in the recorder's court of the City of Bessemer on a charge of disorderly conduct on warrants sworn out by Mrs. E. E. Wilson. The fine in each case was $5 and costs. Both Richard Jordan and Jack Jordan took an appeal from the judgment of conviction in the recorder's court to the Circuit Court of Jefferson County, Bessemer Division. The trial in the Circuit Court of Jefferson County, Bessemer Division, resulted in the acquittal of each of the defendants. The two suits here involved were then filed in the Circuit Court of Jefferson County, Bessemer Division, for malicious prosecution.

As we understand the situation; by stipulation between the parties the record in the recorder's court, showing the conviction therein and the record in the Circuit Court of Jefferson County, Bessemer Division, showing acquittal of the defendants, were introduced in evidence by agreement as being true and correct. The complaint in each case which was filed by the City of Bessemer when the appeal was taken to the Circuit Court of Jefferson County, Bessemer Division, alleged the violation of § 41,

Chapter 16 of the Bessemer Code, in this "That he did disturb the peace of others by violent, offensive, or boisterous conduct or carriage, or by loud or unusual noises, or by profane, obscene or offensive language, calculated to provoke a breach of the peace", it being alleged that § 41, Chapter 16, of the Bessemer City Code reads as follows:

"Sec. 41 Disorderly Conduct. It shall be unlawful for any person to disturb the peace of others by violent, offensive or boisterous conduct or carriage, or by loud or unusual noises, or by profane, obscene or offensive language, calculated to provoke a breach of the peace, or by being drunk or in a state of intoxication in a private place to the annoyance of others."

It will be observed from the aforesaid statement that each of the appellants was convicted in the recorder's court but was acquitted in the circuit court, when the cases were tried on appeal from the judgment of conviction in the recorder's court. In the case of Republic Steel Corporation v. Whitfield, 260 Ala. 333, 70 So. 2d 424, 426, in dealing with the question of probable cause in a suit for malicious prosecution, a rule was laid down, which is applicable here:

"* * * That is, that the judgment of conviction, though later vacated and accused discharged, is prima facie evidence of the existence of probable cause for instituting the prosecution 'which may be rebutted by any competent evidence which clearly overcomes the presumption arising from the fact of defendant's conviction in the first instance.'"

When the present suits for malicious prosecution were tried in the circuit court the court gave the affirmative charge for the defendant in each case and so in reviewing the action of the court in giving the affirmative charge, which is assigned as error in each case, we must determine whether there was competent evidence sufficient to overcome clearly the prima facie presumption of probable cause created by

proof of the conviction in the recorder's court.

While we cannot set out all the evidence in all its detail, we shall undertake to state the substance of the evidence so that the question now before us will be understandable. Apart from the record proof to which we have alluded, the only evidence in the case is the testimony of Mrs. Lucy Jordan, the mother of Richard Jordan and Jack Jordan, the testimony of Richard Jordan and Jack Jordan, the testimony of Tom Randle, the father-in-law of Jack Jordan and the testimony of witnesses with reference to attorneys' fees. The testimony of the witnesses with reference to attorneys' fees is not material to the matter under consideration here.

On or about March 30, 1948, Richard Jordan learned that E. E. Wilson, a practicing attorney in the City of Bessemer, had filed suit with a garnishment for Dr. W. N. Payne on an account against his mother, Mrs. Lucy Jordan, in the Bessemer Civil and Misdemeanor Court. Judge F. R. Mathews, now the Circuit Judge of the Jefferson Circuit Court, Bessemer Division, presided at that time over the Bessemer Civil and Misdemeanor Court. Richard Jordan went to see Judge Mathews at the court house in Bessemer in regard to the suit against his mother with the result that Richard Jordan was informed that Dr. Payne had reduced the claim to $25. Judge Mathews on account of his friendship for Mrs. Jordan made it known that if it was not convenient for the claim to be paid, he would give a check for the amount due which could be repaid at a later time. After this conversation with Judge Mathews, Richard Jordan went to Mr. Wilson's office, which is located on the Fourth Floor of the Realty Building in Bessemer, Alabama.

The office consists of a reception room in the front and a private office in the rear. When he arrived he saw Mrs. E. E. Wilson, the defendant in the case, in the reception room. She is the wife of E. E. Wilson and is his secretary. Richard Jordan did not know Mrs. Wilson and was not acquainted with her husband. He advised Mrs. Wilson that he desired to see Mr. Wilson but was informed by Mrs. Wilson that Mr. Wilson was busy and if he would state the nature of his business she might be able to take care of it. Richard Jordan then told her that he wanted to know the balance owing on his mother's account to Dr. Payne. Mrs. Wilson then proceeded to look up the record of the account and while doing so asked Richard Jordan what he did. Richard Jordan informed her that he was a law student at the University of Alabama, to which Mrs. Wilson laughingly said that, "If you are intending to be a lawyer, I can give you some good advice." Richard Jordan then said, "If you don't mind, please ma'am, just tell me what the balance is. I think the University, I can learn all I need to know down there, if you just tell me what the balance is, that is all I want to know." She then said, "I just don't think I will tell you what the balance is." He then said, "All right, if you feel that way about it, I am sorry" and he walked out the door.

Upon leaving the office of Mr. Wilson, Richard Jordan went to his automobile and drove to his mother's home. While he was at his mother's home she called Mr. Wilson's office and ascertained that the balance on the claim was $8. Richard Jordan then went from his mother's home to the filling station operated by his brother, Jack Jordan, the plaintiff in the other suit, which was located in South Bessemer on Fairfax Avenue and 16th Street, in order to cash a government check for $100. However, he acquainted his brother with the fact that Mr. Wilson had sued his mother and his brother became upset. Jack Jordan then got in his automobile and accompanied Richard Jordan to see Mr. Wilson, testifying, "I had an interest in the thing as well as he did; it was my mother, too." Richard Jordan returned to the court house to see Judge Mathews, leaving his brother in the car. According to the testimony of Judge Mathews given in the disorderly conduct case and introduced by agreement in the instant case, Judge Mathews went off and came back and said that he had been told that the amount of the claim was $8 and asked if he could give a check to pay the claim. Richard Jordan pulled out

some bills out of his pocket and Judge Mathews then said, "You have got more money than I have, go and pay it."

Richard Jordan and Jack Jordan then returned to Mr. Wilson's office and Richard Jordan told Mrs. Wilson that he was there to pay the balance on the account and gave her $8. Mrs. Wilson gave him a receipt for this amount and marked "for balance." Richard Jordan insisted that the receipt be marked "paid in full" or "for balance in full". Mrs. Wilson fixed the receipt as requested but according to Richard Jordan she stated that "any fool knows that balance means in full." Richard Jordan then sat down and stated that he would like to wait to see Mr. Wilson. He testified as follows: "I sat down and when I sat down she looked over at Jack, who was leaning against the door facing, and asked him what did he want and he said, 'I want to see Mr. Wilson'. She said, 'What about?' and she looked over at me and looked back at him. She said, 'Oh, I see the connection. You all are together.' She looked over at me again and said, 'What are you waiting for?' I said, 'I want to see Mr. Wilson'. She said, 'You cannot see him; you cannot see him and you cannot wait in here,' or maybe I said 'If I can't see him I will wait, whenever it is convenient for him I will see him.' I waited for him. She said, 'You can't wait in here, get out of this office.' * * *." Richard Jordan then got up out of the chair and walked out of the door into the hall. According to him he did not say another word. He testified: "When I walked out of the office into the hall, Jack (Jordan) didn't immediately follow. There were some people in the office talking to Mr. Wilson and they came out. I knew one of the people who came out. He was a lawyer named Mr. Ling and he had a negro with him. They came out of the partitioned place where Mrs. Wilson said her husband was. Jack Jordan then started out behind Mr. Ling and his negro client. After everybody was out of the office, all three of us were in the hall. He got out of the way for Mr. Ling and his negro client. He then stepped back completely inside of the office. He wasn't obstructing the door and he then started to make a turn toward the hall. The door was shut against him with his head out in the hall and one foot inside, part of his body in the door, part of it outside the door. Mrs. Wilson closed the door." According to Richard Jordan he heard her say, "Get out of here." Then she slammed the door. Mr. Ling and his client then went down the elevator, which left Richard Jordan and Jack Jordan in the hall. "We stood in the hall, waiting to see Mr. Wilson." The door to his office was shut. "We had no conversation with anybody in the hall and we were not blocking the door to the office of Mr. Wilson. We were not picketing the office of Mr. Wilson. We were just standing and waiting for Mr. Wilson, waiting to see him. Not long after, three policemen came up the elevator and the conversation between them and Mrs. Wilson could be heard."

Richard Jordan said, "I heard her call the police department on the phone and say, 'there are a couple of drunks or something up here bothering me. Will you send somebody up here to get them away from here.' " It was after this that the three officers came up. The door had been opened when she called the police department. I understood Mr. Mullins, the present Chief of Police of the City of Bessemer, to tell Mrs. Wilson that he couldn't arrest us unless she would get a warrant because they had observed no violation of the law. Then Mr. Mullins came out and told us that Mrs. Wilson wanted us arrested but he could not arrest us unless she would sign a warrant and wanted to know what we were there for. Richard Jordan testified that he told Mr. Mullins that "We had a little business with Mr. Wilson and want to see Mr. Wilson in person about it and if I was violating the law in any way, please to tell me, that I don't want to violate the law." I said, "This is a public place. I would like to wait here for Mr. Wilson when he gets out of his office to go home. I will go downstairs with him. If it is disturbing him too much for us to wait for him, I would be glad to ask him if he would talk to me in their presence (the three policemen)."

According to Richard Jordan he was addressing his conversation to all three po-

licemen, especially Mr. Mullins. Richard Jordan said that he would talk to Mr. Wilson in their presence. "I wanted to see him (Mr. Wilson) face to face and explain to him how I felt." Mr. Mullins then informed us that he couldn't go back in the office and take me in there to talk to Mr. Wilson and wouldn't recommend to Mr. Wilson that I talk to him in their presence and that that was not his business. So the policemen then left. Richard Jordan further testified that Mr. Mullins said, "I couldn't tell you boys not to stay in this hallway, you can stay here as long as you want to. It is a public place. I just recommend to you that you don't get close to the door up there." Richard Jordan then said, "Yes, sir. We don't intend to bother their business at all or obstruct the door." The policemen then left. In about 15 or 20 minutes or maybe longer, according to Richard Jordan, Mr. Mullins was back standing there with a paper in his hand and said: "Well, you boys are under arrest."

Richard Jordan further testified on cross-examination that after he knew Mrs. Wilson was going to call the officers, he insisted that they were going to stay there and see Mr. Wilson and have a conversation with him and if they did not like the conversation, "that they were going to have something else with him," but previously in answer to the question, "You could have wanted to whip him?", he said, "No, sir, I couldn't."

After the two brothers were arrested they were taken to jail and at first the warden in charge of the jail refused to allow them to make bond. However bond was made and the two brothers were released from jail in about forty-five minutes.

▆ In Hanchey v. Brunson, 175 Ala. 236, 56 So. 971, 972, quoted with approval in Republic Steel Corporation v. Whitfield, supra, it is said "that 'probable cause,' as the term is employed in actions for malicious prosecution, is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty."

The warrant sworn out by Mrs. Wilson charged these two defendants, Richard Jordan and Jack Jordan, with disorderly conduct. The ordinance of the City of Bessemer constituting the offense of disorderly conduct shows that it shall be unlawful for any person to disturb the peace of others by violent, offensive or boisterous conduct or carriage or by loud or unusual noises or by profane, obscene or offensive language calculated to provoke a breach of the peace or by being drunk or in a state of intoxication in a private place to the annoyance of others.

In considering the evidence we find that there was no profanity or abusive language used by either Richard Jordan or Jack Jordan. No threats were made by them. There was no loud noise. There was no proof that the two brothers were in a state of intoxication. They wanted to see Mr. Wilson and talk to him. They did not obstruct the office of Mr. Wilson and offered to talk to him in the presence of the officers, a privilege which they were denied. The officers when they came the first time refused to arrest the brothers, stating that they were committing no offense.

▆▆ We must not be governed by what Mrs. Wilson may have considered disorderly conduct unless in the light of the foregoing authority there was such conduct as would lead her as a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion that these men were guilty of disorderly conduct. It is true that the two brothers lingered for awhile in the office of Mr. Wilson and outside in the office in the hallway in an insistent effort to talk to him. But upon a consideration of all the evidence we think that differing inferences may be drawn as to whether or not a person of ordinary caution and prudence could base an honest and strong suspicion that the brothers were committing a breach of the peace. Certainly we think that a jury should have had a right to determine wheth-

er under the definition of probable cause which has been given, Mrs. Wilson had probable cause for such belief. Hanchey v. Brunson, supra; Little v. Little, 4 N.J. Super. 352, 67 A.2d 201; 34 Am.Jur. § 162, p. 796.

It is our view that the evidence made a case for the jury as to whether the evidence was sufficient to overcome clearly a presumption of probable cause. Accordingly, there was error on the part of the court in giving the affirmative charge in each of the cases.

It results that the judgments of the lower court are due to be reversed and the causes remanded.

Reversed and remanded.

and MERRILL, JJ., concur.
LIVINGSTON, C. J., and LAWSON