Barbara A. NESMITH and Richard A. Nesmith, Appellants,

v.

H. D. ALFORD et al., Appellees.

No. 19609.

United States Court of Appeals Fifth Circuit.

May 30, 1963.

Benjamin E. Smith, New Orleans, La., Clifford J. Durr, Montgomery, Ala., for appellants.

Hugh Maddox, John Peter Kohn, Jr., Montgomery, Ala., Calvin M. Whitesell, Ira Dement, Whitesell & Dement, Montgomery, Ala., for appellees Sullivan and Alford.

Thomas B. Hill, Jr., James J. Carter, Hill, Hill, Stovall & Carter, Montgomery, Ala., for appellee Eiland.

Before RIVES, CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal from adverse judgments on jury verdicts denying claims for damages for arrest, imprisonment and criminal prosecution of white persons triggered by their eating with Negroes in a public restaurant in Montgomery, Alabama, presents a number of questions both of Alabama and federal law. Basic to each claim is the question whether the trial Court should have granted instructed verdicts as to liability on each of the three theories of recovery. To the extent that one or more or all of the counts presented jury issues, there is a question as to the correctness of jury charges given or refused. Next there is a question of admissibility of evidence of prior racial strife which the Court allowed as bearing on good faith. Finally, there is the question whether the instructed verdict for one of the defendant police officers was proper. As to this latter item, we affirm. As to the other matters, we hold there was error for the reasons later discussed. We accordingly reverse and remand.

The Plaintiffs who have perfected their appeal to this Court as Appellants are Dr. and Mrs. Richard Nesmith. Filling out the cast of characters as Defendants-Appellees are Commissioner of Public Affairs Sullivan, Chief of Police Ruppenthal, Desk Captain Eiland, and Police Sergeant Alford. The Complaint is in three counts. Of these Count I for malicious prosecution and Count II for false imprisonment are Alabama-Erie claims resting on diversity jurisdiction. 28 U.S.C.A. § 1332. Count III seeks $50,000 damages caused by the conspiracy of the Defendants acting under color of state law to deprive Plaintiffs of their constitutional rights contrary to the Federal Civil Rights Acts. 42 U.S.C.A. § 1983; 28 U.S.C.A. § 1343. The District Court, after instructing a verdict in favor of Captain Eiland, submitted the case to the jury as to all other Defendants and all counts under a general charge. A general verdict for each of the Defendants as to each of the Plaintiffs was returned. Judgments of dismissal were entered on the verdicts. For a case so fraught with emotional overtones from local racial patterns and practices, the case was remark-

ably free from any real dispute as to underlying facts.

## I.

Dr. Nesmith was the Dean of Men and head of the Sociology Department at MacMurray College in Jacksonville, Illinois. As part of the scholastic program, his students often went on field trips. On this particular trip in the spring of 1960, Dr. Nesmith, his wife (who went along as a chaperone), their two-year-old daughter, and ten students went south to study, among other things, the use of the non-violent technique as a method of sociological change in relation to the so-called "Montgomery Bus Boycott." See Browder v. Gayle, M.D. Ala., 1956, 142 F.Supp. 707, affirmed, 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.

The group arrived in Montgomery, Alabama about 10:00 p. m. on the night of March 30, 1960. The following morning they interviewed the Montgomery Improvement Association, a Negro organization. As lunchtime approached, the discussion was not concluded, so the entire group, both Negro and white, adjourned to the Regal Cafe, a Negro cafe in a Negro neighborhood. The group arrived at the cafe shortly before 12:00 noon and proceeded to a private dining room from which they could neither see out nor could people on the outside see in. At the time of arrival, the street outside the cafe was relatively quiet. A few people were walking around, sunning, reading on their porches, etc.

At approximately 11:45 a. m., Desk Captain Eiland of the Montgomery Police Department received a telephone call from an unidentified person who stated that some young white girls were going into the Regal Cafe with Negroes. Eiland relayed this information to Inspector Cox and told him to investigate. Cox arrived about 12:15 p. m. and looked the situation over. He found an orderly group of whites and Negroes sitting around a table having lunch and engaging in discussion. Cox asked the executive secre-

tary of the Montgomery Improvement Association if all of these people were from Montgomery, to which he got a negative answer. Cox then went outside and called his superior, Sergeant Alford, "and told him what the situation was." [1] A few minutes later, Alford came on the scene. Alford looked inside the cafe and immediately reported the situation to Chief of Police Ruppenthal. A crowd had started gathering outside the cafe and had congested the area to such an extent that by the time Ruppenthal arrived, he was forced to park some 300 yards away from the cafe.

Eventually there were numerous policemen, including some state highway patrolmen, in and around the cafe. Ruppenthal recognized Rev. DuBose, a negro with the group, as being the leader in a recent march on the Capitol. (See Part II). Someone began taking pictures of the mixed group inside the dining room. At no time was loud or boisterous language used inside the cafe, nor were there indications of violence of any type. Ruppenthal waited inside the cafe for forty-five minutes to see if "they were going to leave or anything." At no time were the members of the group informed that they were violating the law or that they must leave the cafe. According to Ruppenthal, "they made no attempt to leave."

In the meantime, Commissioner Sullivan had arrived. Someone told Sullivan that these people wouldn't leave; he assumed someone had asked them to leave, and they had refused. Sullivan telephoned the city attorney and described the situation. The attorney advised Sullivan that these people should be removed from the premises to prevent further trouble.

Sullivan told Ruppenthal to "move them out." Ruppenthal told Alford to get some transportation, meaning, of course, vehicles to carry these people to jail. Alford complied. Ruppenthal walked up to the group and said, "All right,

1. Cox then makes his exit as he was called to investigate a robbery in another part of the city.

let's go." "You, you and you." There was no warrant presented, nor was there any explanation given as to why the arrests were being made. The entire group was taken forcibly to the police station; the men were loaded into the paddy wagon, the women in cars.

By this time, the crowd outside had reached sizeable proportions, estimates ranging from 50 to 150 persons, consisting largely of Negroes. However, the streets were completely congested with cars containing white persons. After the arrests, the police quickly dispersed the crowd and started cars moving again on the streets.

Upon arrival at the police station, the prisoners were processed and placed in jail. The minor child of Dr. and Mrs. Nesmith was taken from them. About 6:00 o'clock of the same evening, Dr. and Mrs. Nesmith through their lawyer arranged for bail and were let out. The remainder of the group stayed in jail overnight. The parents immediately began the search for their child which ended about 10:00 o'clock that night. Although the child had apparently been well taken care of by the Juvenile Court matron and suffered no harm, Mrs. Nesmith testified that she suffered much anxiety during this time as to the whereabouts and well being of her child.

The next morning (April 1, 1960) Assistant Chief of Police Stanley (who is otherwise not involved in this case) told Sergeant Alford that he had so to speak been elected to sign some affidavits charging each member of the group with disorderly conduct in violation of a recent city ordinance which had been passed on advice of counsel to more fully comply with the state law concerning the same offense. Alford signed the affidavits in blank. They were subsequently filled in and warrants issued by Desk Captain Eiland. Although it was believed not necessary to have warrants for a prosecution in the local Recorder's Court (municipal court), it was thought better to provide warrants in the event there should be an appeal. Trial was held that same morning in Recorder's Court of the City of Montgomery. Alford, Ruppenthal and Sullivan each testified. The entire group was convicted of disorderly conduct and let out on bond.

Appeals were taken to the Circuit Court of Montgomery County. Presumably following the usual procedure when a case is appealed from the Recorder's Court, the prosecutions there were on complaints filed by the City Attorney. Upon trial de novo, the jury found all of the defendants not guilty with the exception of Dr. Nesmith. He appealed to the Alabama Court of Appeals which reversed the conviction for a defect in the complaint on the authority of DuBose v. City of Montgomery, 1961, 41 Ala.App. 233, 127 So.2d 845. This was on April 12, 1961. At that time the one-year statute of limitations had run. The complaint was accordingly dismissed.

## II.

■ Over the strong objection of Plaintiffs, the trial Court admitted testimony concerning prior racial incidents in Montgomery. It facilitates discussion of this claim of error to summarize this evidence separately. The synopsis is stated most favorably to the jury verdicts, and hence the Defendants.

On February 25, 1960, there was an attempt by some Negro students to integrate the lunch room in the court house in Montgomery, Alabama. On February 27, a Negro woman was struck on the head with a baseball bat by a white boy. The following day, there were protest demonstrations at Alabama State College, a Negro college in Montgomery. On March 1, there was a widely publicized Negro march on the State Capitol led by Rev. DuBose. On March 6, Negroes assembled at a local Church and announced their intention to go to the Capitol where a crowd of whites had gathered awaiting their arrival. Anticipated violence was avoided by action of the police in dispersing the crowds. On March 8 and 10, there were protest demonstrations at Alabama State College. Responding to a telephone call from the campus reporting that things

were getting out of hand, the police patrolled this demonstration.

In short, the Defendants claimed that this showed that for a period of about a month prior to March 31, 1960, the City of Montgomery was on edge with, and from, racial strife. See Dixon v. Alabama State Board of Education, M.D. Ala., 1960, 186 F.Supp. 945, reversed, 5 Cir., 1961, 294 F.2d 150.

### III.

■■ The count as to false imprisonment presents the fewest intrinsic problems. Besides a motion for instructed verdict as to all counts, Plaintiffs requested a specific charge as to false imprisonment which was tantamount to a motion for directed verdict under F.R. Civ.P. 50. Had the motion or the requested charge been given, only the question of damages would have been open for jury determination. We hold that the initial arrest and imprisonment of Plaintiffs was unlawful as a matter of law.[2]

■ As to this count and the separate one for malicious prosecution, we are bound by Alabama law. As to both, it is pertinent to point out the distinction between the two since Alabama consciously recognizes this distinction. Accepted treatises point this out. "The kindred action of malicious prosecution protects interests closely related to those involved in false imprisonment, and sometimes the two are confused by the courts.[3] Malicious prosecution is the groundless institution of criminal proceedings against the plaintiff. False imprisonment fell within the action of trespass, as a direct interference with the plaintiff's person * * *. The distinction between the two lies in the existence of valid legal authority for the restraint imposed. If the defendant complies with the formal requirements of the law, as by swearing out a valid warrant, so that the arrest of the plaintiff is legally authorized,[4] the court and its officers are not his agents to make the arrest, and their acts are those of the law and the state, and not to be imputed to him. He is therefore liable, if at all, only for a misuse of legal process to effect a valid arrest for an improper purpose. The action must be for malicious prosecution, upon proof of malice and want of probable cause, as well as termination of the proceeding in favor of the plaintiff." Prosser, Torts § 12, p. 53 (2nd ed. 1955).

■ Nor in other significant respects do we find Alabama law to be at substantial variance with the common law as generally developed in the other states. All that is necessary to establish false imprisonment is that an individual be restrained of his liberty under the probable imminence of force without any legal cause or justification therefor.[5] It is not necessary to show actual force, threats, or injury done to the individ-

2. The confinement of Dr. Nesmith on May 10 after his conviction in the Circuit Court flows from that conviction, rather than the initial arrest and is an element in the count for malicious prosecution.

3. At this point the author in note 58 further stated: "The frequency of such confusion is pointed out in Rich v. Mc-Inery, 1894, 103 Ala. 345, 15 So. 663, 49 Am.St.Rep. 32." It is remarkable how the author emphasizes Alabama decisions to illustrate the distinction. See § 98, Malicious Prosecution, p. 646, where reference is " * * * made again to the distinction between malicious prosecution and the kindred tort of false imprisonment, in cases of arrest and confinement. * * *." To the textual statement that " * * * the difference is one of the regularity of the legal process under which the plaintiff's interests have been invaded," note 11 declares, "The distinction is well stated in Sears, Roebuck Co. v. Alexander, 1949, 252 Ala. 122, 39 So.2d 570."

4. Alabama apparently holds that the legal process need not be letter perfect if the papers are a "colorable" charge of an offense. Hotel Supply Co. v. Reid, 1918, 16 Ala.App. 563, 80 So. 137, 138; Shannon v. Simms, 1906, 146 Ala. 673, 40 So. 574.

5. Rich v. McInery, 1894, 103 Ala. 345, 15 So. 663; Daniels v. Milstead, 1930, 221 Ala. 353, 128 So. 447; King v. Gray, 1914, 189 Ala. 686, 66 So. 643; Central of Ga. Ry. v. Carlock, 1916, 196 Ala. 659, 72 So. 261.

ual's person, character, or reputation.[6] The lack of malice, the presence of good faith, or the presence of probable cause do not affect the existence of the wrong when the detention is unlawful.[7] If the act of the officer arresting a person without a warrant is unlawful, the imprisonment is false.[8]

It is undisputed that the plaintiffs here were arrested and taken to the police station where they remained for some four or five hours without their consent. Apart from the matter of money damages, there are only two questions. The first is whether the arrest was lawful, i. e., justified by some valid authority or right. Second is the question of the individual liability of each of the defendant offices.

 As to the issue of individual liability, each of the three defendants—Sullivan, Ruppenthal and Alford—acted as one. Although there was no prior plan devised to bring about the arrest and imprisonment of the plaintiffs, each of the three had a substantial role in bringing about the results. This was an instance of the typical "chain of command," Sullivan indicating to Ruppenthal that the Plaintiffs should be removed from the cafe, Ruppenthal giving the authoritative commands constituting the arrest, and Alford providing the essential transportation at the direction of Ruppenthal. Their actions throughout the whole sequence of events are so intertwined and interlocking that these Defendants must fall together.

 Nor can there be any doubt as to the total lack of legal justification for the arrest without a warrant.[9] The Plaintiffs were merely eating lunch with a group of Negroes. This was no crime. This was no breach of the peace. The Defendants as public officers were vividly aware that the former city ordinances enforcing segregation of the races in public places, including restaurants, had been repealed.[10] As a part of this massive overhaul and repeal of segregation laws, an amended disorderly conduct ordinance was adopted.[11] There was no

6. Daniels v. Milstead, 1930, 221 Ala. 353, 128 So. 447; Burk v. Knott, 1924, 20 Ala. App. 316, 101 So. 811.

7. De Armond v. Saunders, 1942, 243 Ala. 263, 9 So.2d 747; Phillips v. Morrow, 1923, 210 Ala. 34, 97 So. 130; Oates v. Bullock, 1903, 136 Ala. 537, 33 So. 835; Daniels v. Milstead, 1930, 221 Ala. 353, 128 So. 447. Although these elements are not essential to establish the claim, the above cases also indicate that the presence of malice, lack of good faith and want of probable cause may be shown in aggravation of punitive damages.

8. Daniels v. Milstead, 1930, 221 Ala. 353, 128 So. 447; Strain v. Irwin, 1915, 195 Ala. 414, 70 So. 734; Standard Oil Co. v. Davis, 1922, 208 Ala. 565, 94 So. 754.

9. See Title 15 § 154, Code of Alabama of 1940 as amended: "Arrest by officer without warrant; when and for what allowed.—An officer may also arrest any person, without warrant, on any day and at any time, for any public offense committed, or a breach of the peace threatened in his presence; or when a felony has been committed, although not in his presence, by the person arrested, or when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it; or when he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed; or on a charge made, upon reasonable cause, that the person arrested has committed a felony."

10. Chapter 10, § 14, Code of the City of Montgomery of 1952, provided:
"§ 14. It shall be unlawful to conduct a restaurant or other place for the serving of food in the City, at which white and colored people are served in the same room, unless such white and colored people are effectually separated by a solid partition extending from the floor upward to a distance of seven feet or higher and unless a separate entrance from the street is provided for each compartment."
This was repealed by Ordinance 13–60 effective March 24, 1960, barely a week before this incident.

11. As amended by Ordinance No. 11–60, effective March 24, 1960, § 18. Chapter 20, Code of the City of Montgomery provided:
"It shall be unlawful for any person in the city to disturb the peace of others by violent, profane, indecent, offensive or boisterous conduct or language, or by conduct calculated to provoke a breach of the peace."

disturbance inside the cafe. Nor was there any action inside the cafe which remotely came within the conduct proscribed by the amended ordinance, note 11, supra. The only possible threat of a disturbance was on the outside where crowds had gathered. We may assume, as contended by Defendants, that the crowds had gathered, not merely out of curiosity from the large number of policemen in the area, but out of a spontaneous sense of outrage to the reported presence in the building of Negroes and whites eating together contrary to accepted social custom and usage.

■■■■■■■ Indulging this and all other assumptions favorably to the jury verdict, there is yet no single Alabama case to indicate that the suspected threat of mob violence at the hands of law breakers may be avoided by arresting those whose actions are perfectly peaceful and legally and constitutionally protected merely because such lawful and peaceful conduct provocatively incites the incipient mob.[12] And we are equally clear that Alabama would not do so in the future. We must, and do, assume that under the Supremacy Clause, Article 6 of the Constitution, Alabama courts will construe state statutes and ordinances in keeping with federally paramount constitutional principles. Great latitude is, and must be, extended to states in the determination of what conduct constitutes a crime or in ascertaining guilt or innocence. But before there may validly be the imposition of criminal sanctions in the form of fine or imprisonment, or both, there must be a crime defined and a crime committed. Thompson v. Louisville, 1960, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654; Garner v. Louisiana, 1961, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207; Taylor v. Louisiana, 1962, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395.

■■■■■ And as to an episode much more provocatively charged than our case, the Supreme Court has just recently rejected on constitutional grounds, convictions for similar, so-called breaches of the peace. Edwards v. South Carolina, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697. Distinguishing that situation as we readily do so here from other cases,[13] the Court declared that "it is clear to us that in arresting, convicting, and punishing the petitioners under the circumstances disclosed by this record, South Carolina infringed the petitioners' constitutionally protected rights of free speech, free assembly, and freedom to petition for redress of their grievances." 372 U.S. at 235, 83 S.Ct. at 683, 9 L.Ed. 2d 697. Where in South Carolina the thing which "stirred people to anger, invited public dispute, or brought about a condition of unrest," 372 U.S. at 238, 83 S.Ct. at 685, 9 L.Ed.2d 697, was the words spoken or uttered by the demonstrators, here it was the simple, peaceful act of Negroes and whites eating together. But of this, the Court's words are none the less applicable. "[T]hey were convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." 372 U.S. at 237, 83 S.Ct. at 684, 9 L.Ed. 2d 697. Whatever might be the peaceful means of expressing disagreement with views, policies or practices, we are freshly aware that the "Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views." 372 U.S. at 237, 83 S. Ct. at 684, 9 L.Ed.2d 697.

■■■■■ We may credit the concern which these police officers testified they felt. We think the circumstances exist-

---

12. Indeed, pointing in the opposite direction is Jordan v. Wilson, 1955, 263 Ala. 625, 83 So.2d 340, 345. The Court was there dealing with a city ordinance similar in many respects to the one here involved (note 11, supra).

13. Feiner v. New York, 1951, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295; Chaplinsky v. New Hampshire, 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; cf. Cantwell v. Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213.

ing that day and their stated good faith apprehensions were admissible as bearing upon the question of punitive, though not compensatory, damages.[14] But liberty is at an end if a police officer may without warrant arrest, not the person threatening violence, but those who are its likely victims merely because the person arrested is engaging in conduct which, though peaceful and legally and constitutionally protected, is deemed offensive and provocative to settled social customs and practices. When that day comes, freedom of the press, freedom of assembly, freedom of speech, freedom of religion will all be imperiled. For the exercise of each must then conform to what the conscientious policeman regards the community's threshold of intolerance to be. Consequently, as to this count, the judgment is reversed and rendered as to liability leaving open for a retrial the question of damages, compensatory and punitive.[15]

## IV.

 The count for malicious prosecution presents more difficulty. This flows from its nature, not from any peculiar Alabama concept. Alabama subscribes to the traditional elements of the claim which Prosser summarizes:

"1. A criminal proceeding instituted or continued by the defendant against the plaintiff.

"2. Termination of the proceeding in favor of the accused.

"3. Absence of probable cause for the proceeding.

"4. 'Malice,' or a primary purpose other than that of bringing an offender to justice." Prosser, Torts, § 98, p. 646 (2nd ed. 1955).

The distinction previously discussed between it and false imprisonment must be kept in mind. "Malicious prosecution is the less rigorous of the two remedies. It assumes that the defendant has proceeded under proper legal formalities, and therefore takes into account his good motives and probable cause for his conduct, which are immaterial in false imprisonment. * * *." Ibid.

 The first two elements were sufficiently established. A criminal proceeding was instituted in the Recorder's Court and carried forward in the Circuit Court.[16] And the proceedings were terminated favorably to the accused, by the

14. "While malice is not an essential element of false imprisonment and the existence or nonexistence of same does not go to the plaintiff's right of action, it will be considered to increase or mitigate the damages. * * * [E]vidence of the ill will of the defendant toward the plaintiff, of the lack of reasonable cause for the imprisonment, or of wanton abuse of the process by the defendant, may be admitted to enhance damages. And on the other hand, evidence of the defendant's good faith, and of his having reasonable grounds to believe that his action was lawful, is admissible to rebut the claim of vindictive damages, but not to reduce the verdict below the actual damages suffered. 11 R.C.L. p. 821; Beckwith v. Bean, 98 U.S. 266, 25 L.Ed. 124; Rogers v. Wilson, Minor, 407, 12 Am.Dec. 61; Oates v. Bullock, 136 Ala. 537, 33 South. 835, 96 Am.St.Rep. 38; Sanders v. Davis, 153 Ala. 375, 44 South. 979." Phillips v. Morrow, 1923, 210 Ala. 34, 97 So. 130.

15. By this conclusion we also hold that it was error for the Court to give (over Plaintiff's objection) Defendant's requested charge No. 9 which was restricted by its terms to the false imprisonment count. Charge No. 15, whether or not similarly restricted, was also erroneous since it permitted mitigation for good faith of "any damages," not just punitive damages. (see note 14, supra).

16. Curiously, the record reflects that the Desk Captain issued the formal warrants on the morning of April 1 immediately prior to the trial because it was "understood" that the Defendants wanted to appeal the decisions in a case not yet tried. Apparently prosecutions may be had in Alabama City Courts by notice without formal warrant or arrest. See, e. g., Sears, Roebuck & Co. v. Alexander, 1949, 252 Ala. 122, 39 So.2d 570; McKinstry v. City of Tuscaloosa, 1910, 172 Ala. 344, 54 So. 629, 630. In any event, new complaints were apparently signed (but not verified) by the City Solicitor before the de novo retrial of the cases in the Circuit Court.

jury verdict in the Circuit Court as to Mrs. Nesmith and by the final dismissal as to Dr. Nesmith after reversal and remand by the Court of Appeals. As to elements three and four, we certainly agree with the District Court's denial of motion for instructed verdict made by each of the Defendants. There was ample evidence justifying a submission. The more serious question is whether the Plaintiffs were entitled to an instructed verdict as to liability on this count.

 The Alabama rule is very plain that as to element (3) want of probable cause, it is a question of law for the court if there is no dispute as to the facts.[17] The Alabama standard of probable cause in actions for malicious prosecution appears to be the traditional one. It is, says the Court, "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty"[18] of the offense for which he is arrested, charged and tried.[19]

 If the matter stopped there, it would be simple. For all of the reasons discussed at length in Part III with respect to false imprisonment, two things are clear. First, there is no dispute about the facts. Second, no person on those facts could have entertained an honest and strong suspicion or belief that the Nesmiths and their companions were guilty of any offense whatsoever and none certainly that they were guilty of the alleged offenses of disorderly conduct provoking a breach of the peace. But applying, as we must, Alabama law, we must reckon with the further authoritative declarations by Alabama Courts that a conviction for the offense charged, even though subsequently reversed, is prima facie evidence of the existence of probable cause.[20] Plaintiffs seek to escape the impact of this rule by contending that the Recorder's Court of the City of Montgomery is not such an independent judicial tribunal as to warrant this evidentiary presumption. This rests on the assertion that under Alabama statutes the entire legislative, executive and judicial functions of government are lodged in the City Commission thus depriving the appointive Judge of the Recorder's Court of minimal independence. The trial Judge rejected this view, as do we.[21] It was uncontradicted that Montgomery operated under the merit plan, and the Judge of the Recorder's Court

17. Key v. Dozier, 1949, 252 Ala. 631, 42 So.2d 254, at 256. "[I]f the facts on the issue of probable cause are not in dispute, whether such facts amount to probable cause is a question of law for the court.—Brackin v. Reynolds, 239 Ala. 419, 194 So. 876." Huffstutler v. Edge, 1950, 254 Ala. 102, 47 So.2d 197. See also Prosser, Torts § 98, p. 658 (2nd ed. 1955); Restatement, Torts § 673(1) (1938).

18. Jordan v. Wilson, 1955, 263 Ala. 625, 83 So.2d 340, 345. The rule has many times been stated. See, Hanchey v. Brunson, 1911, 175 Ala. 236, 56 So. 971, 972; Republic Steel Corp. v. Whitfield, 1953, 260 Ala. 333, 70 So.2d 424.

19. The honest belief referred to "must be * * * that the accused is the guilty party." Gulsby v. Louisville & N. R. R., 1910, 167 Ala. 122, 52 So. 392, 395.

20. Prosser, Torts, § 98, p. 657–8 (2nd ed. 1955), points out that the majority rule that an initial conviction, subsequently reversed, "is held to be conclusive as to the existence of probable cause" is rejected by "a considerable minority view which regards the conviction as creating only a presumption, which may be rebutted * * *." To this in note 43 is cited Ex parte Kemp, 1919, 202 Ala. 425, 80 So. 809, in which Alabama made a deliberate choice. The rule is now phrased this way.
"* * * That is, that the judgment of conviction, though later vacated and accused discharged, is prima facie evidence of the existence of probable cause for instituting the prosecution 'which may be rebutted by any competent evidence which clearly overcomes the presumption arising from the fact of defendant's conviction in the first instance.'" Jordan v. Wilson, 1955, 263 Ala. 625, 83 So.2d 340, 342. The language is from Ex Parte Kemp, supra.

21. In Jordan v. Wilson, supra, note 20, supra, the initial conviction was in a municipal Recorder's Court.

was subject to dismissal only for cause. In any event, this would not suffice as to Dr. Nesmith's case since, unlike his wife, he was convicted a second time in the Circuit Court by a jury and favorable termination came only from dismissal after reversal and remand from the Court of Appeals.

While we thus reject this contention of Plaintiffs, we conclude that under Alabama law these intervening convictions are not adequate to create any doubt or uncertainty as to facts which are clear and undisputed. In other words, when the facts—clear and uncontradicted as they are here—show without any doubt whatsoever that there was not a single basis for anyone charging either of these Plaintiffs with disorderly conduct provoking a breach of the peace, neither those facts nor the inferences to be drawn from them are changed in any degree by jury verdicts of guilty which ought never to have been returned had the Recorder's Court dismissed the charges on the completion of the prosecution's case as the law so positively compelled.

As the Alabama rule reflects (note 20, supra) that the prima facie conclusion may be rebutted by evidence "which clearly overcomes the presumption," it is plain that the Court retains a function. It continues to be bound by the Alabama Rule that the question of probable cause is one of law. The jury's sole function is to ascertain the facts.[22] Next, the Court must determine whether the so-called rebuttal evidence "clearly overcomes" the presumption. If there is a place for judicial determination of that matter—and there is—then it is in keeping with the traditional judicial role to ascertain that it so "clearly overcomes" as to leave no question at all. Any other rule here would be to leave to the jury the determination of whether the officers' actions were "reasonable." And it is that question which Alabama holds is one of law on undisputed facts.

The consequence is that the trial Court erred in not giving the instruction requested in various forms charging the jury as a matter of law that there was no probable cause for the arrest and prosecution of the Plaintiffs.

But there is still the vital elements of malice. "Malice in this sort of action implies the intentional doing of a wrongful act to the injury of another." Huffstutler v. Edge, 1950, 254 Ala. 102, 47 So.2d 197, 199. "Malice may be defined to be any 'indirect motive of wrong.' Any motive, not a *bona fide* purpose, or, not associated with a *bona fide* purpose, of bringing a person to punishment as a violator of criminal law, is a malicious motive on the part of the person who acts under its influence." Jordan v. Alabama G.S.R.R., 1886, 81 Ala. 220, 8 So. 191, 192. Considering that this involves the motivation for these criminal prosecutions, the circumstances will be rare and the facts almost positively uncontradicted in which a Court as a matter of law can rule that a prosecution was commenced or continued with malice. Absence of probable cause—which we have just held to be established as a matter of law—does in Alabama afford a basis from which to infer malice.[23] But the elements are not synonymous. And the converse of this is not true as the Alabama cases decline to infer lack of probable cause from established ma-

---

22. See Huffstutler v. Edge, supra, "When there is a conflict in the evidence as to material facts relevant to that issue [probable cause], a finding of the facts on that basis is one of fact not of law. But the legal effect of such finding on the issue of probable cause is one of law for the court and not one of fact." 47 So. 2d 197, 198.

 It is this unusual role of the jury for a tort case which commends as the "bet-

ter * * * method" the use of "a special verdict * * * under which" the jury makes findings upon which "the court then determines whether the defendant had probable cause." Restatement, Torts § 673, comment d, p. 437.

23. Huffstutler v. Edge, 1950, 254 Ala. 102, 47 So.2d 197, 199; Parisian Co. v. Williams, 1919, 203 Ala. 378, 83 So. 122.

lice.[24] It is a question for the jury whether a want of probable cause requires a finding of malice if there is any evidence to show that the prosecutor honestly believed there was such cause. O'Neal v. McKinna, 1897, 116 Ala. 606, 22 So. 905, 909.

 We think, however, that consistent with the broad definitions of malice followed by Alabama Courts, it would have been malice as a matter of law if these Plaintiffs were arrested and the prosecution commenced and continued *solely* because they were eating with Negroes in a public restaurant.[25] And even though not the *sole* cause, if such a motive was the principal, primary, or predominant one for continuing the prosecution, malice would be established as a matter of law. Obviously there was sufficient evidence for the jury to draw that inference,[26] but we do not think that on the present record this was established as a matter of law. Consequently, the underlying factual question of whether the prosecution was solely for that reason had to be resolved by the jury. Though requested by the Plaintiffs, the Court erroneously declined to submit that issue. A suitable instruction should be given.

The result is that the counts as to malicious prosecution must be reversed and remanded for a retrial on the issue of malice and damages, actual and punitive.

## V.

For reasons next discussed in Part VI, we hold that the trial Court erred in admitting the evidence of prior racial strife (see Part II). As this necessitates a retrial of the claim for Civil Rights, it is appropriate to rule on objections here urged covering matters which may well reoccur.

This count was based on 42 U.S.C.A. § 1983. It was stipulated that the Defendants' actions were done under color of state law. We have no doubt that as to a number of the actions, the proof showed as a matter of law that the conduct of one or more or all of the three officers at the restaurant violated one or more Civil Rights. To this extent, the plaintiffs' motions for instructed verdict certainly ought to have been granted.

 Certainly since Monroe v. Pape, 1961, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492, violation of some of the Civil Rights of these Plaintiffs was established as a matter of law. These included the freedom from unlawful arrest,[27] freedom of speech and freedom of association.[28] This includes the freedom of a white man peacefully to associate with Negroes in a public restaurant free from the actual or threatened arrest by

---

24. Jordan v. Alabama G. S. R. R., 1886, 81 Ala. 220, 8 So. 191, 192.

25. While Jordan v. Alabama G. S. R. R., note 24, supra, rejected the idea that to escape a judgment of malicious prosecution the defendant's motive for institution "must be single, 'for the purpose of bringing a person to justice.'" 8 So. 191, 193, it is clear that this must be at least one of the motives.

26. Officer Alford testified:
"Q. Now, in—in what way did the—who—whose—whose peace did the people in the cafe disturb?
"A. The neighborhood.
"Q. The neighborhood; in what way did they disturb it?
"A. The City of Montgomery.
"Q. I said what way did the people in the cafe disturb it?

"A. Customs that people was in the —accustomed to, and they didn't appreciate it and didn't like it."

27. Coleman v. Johnston, 7 Cir., 1957, 247 F.2d 273; Hughes v. Noble, 5 Cir., 1961, 295 F.2d 495; Hardwick v. Hurley, 7 Cir., 1961, 289 F.2d 529; Cohen v. Norris, 9 Cir., 1962, 300 F.2d 24; Hoffman v. Halden, 9 Cir., 1959, 268 F.2d 280.

28. Edwards v. South Carolina, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; Louisiana ex rel. Gremillion v. N. A. A. C. P., 1961, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301; Bates v. Little Rock, 1960, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed. 2d 480; N. A. A. C. P. v. Alabama, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Anderson v. Moses, S.D.N.Y., 1960, 185 F.Supp. 727.

police officers as a means of enforcing racial segregation.[29]

▄ It is equally clear that the personal accountability of each of the three officer Defendants was established as a matter of law with respect to some of these violations. Thus, as we pointed out in Part III, the arrest and imprisonment of the Plaintiffs without warrant was both unlawful and participated in by each of the three Defendants, Sullivan, Ruppenthal and Alford. It also constituted a flagrant violation of federal Civil Rights. Each of these Defendants participated in this action and each is liable individually to the Plaintiffs for the full damages occasioned by such conduct. Consequently, the Plaintiffs were to this extent likewise entitled to an instructed verdict.

▄ But two things complicate the problem for the trial judge. The first is that there are some actions which, although not so as a matter of law, might yet be found by the jury to be a violation of Civil Rights. The second is that as to these (and also under some circumstances those acts which constitute violations as a matter of law), there is the question of the persons who are legally accountable. In connecting the acts with the Defendants, civil liability for money damages of the respective Defendants would depend on traditional tort principles. Each such action will have to be brought home to each Defendant or imputed to him constructively. Unless— as was so with respect to the initial arrest and imprisonment—this is established as a matter of law, liability of the respective individuals as to such conduct would stand or fall on jury findings, express or implied,[30] showing personal action or that imputed by conspiracy, agency, partnership, respondeat superior,

---

29. The Court, without objection, charged as follows: " * * * I charge you that it is * * * set out in the Constitution * * *, that every person is guaranteed the right of free assembly and free association. Under the Constitution and laws of the United States, a person is guaranteed freedom of speech, freedom of association, freedom from arrest, except upon probable cause, * * *. A person has a right not to be deprived of his liberty without due process of law. A person has a constitutional right of association, and a state or any officer thereof, or a city or any officer thereof, may not enforce racial segregation. * * *."

The Court then went on to charge the defense theory that the officers "were only seeking to maintain law and order, and the actions of the Plaintiffs * * * were calculated to constitute a breach of the peace." The Judge followed this with the dictum from Agnew v. City of Compton, 9 Cir., 1956, 239 F.2d 226, 231, "No one has a constitutional right to be free from a low officer's honest misunderstanding of the law or facts in making an arrest." Where the facts, as here (see Part IV), show no crime whatsoever being committed, we cannot approve this as to an arrest without a warrant. In addition, the case has been considerably undermined if not repudiated by its authors. Cohen v. Norris, 9 Cir., 1962, 300 F.2d 24, 29.

We would also have considerable doubt that for the situation revealed by the uncontradicted facts of this record, the instruction following immediately thereafter as to "probable cause" and lifted almost verbatim from Russo v. Miller, 221 Mo.App. 292, 3 S.W.2d 266, 269, quoted by the Court in Mueller v. Powell, 8 Cir., 1953, 203 F.2d 797, 800, was here appropriate. That case dealt with probable cause for an arrest for a capital felony, not a mere alleged misdemeanor breach of the peace. While we do not say that violation of Civil Rights will be categorized into misdemeanor or felony as done under local state law, we do think that anything as sacred as constitutional rights must take into account the quality of the actions in the light of the quality of the suspected crime. Of course, in determining Federal Civil Rights, it is Federal, not State, law which controls. Pritchard v. Smith, 8 Cir., 1961, 289 F.2d 153; Marshall v. Sawyer, 9 Cir., 1962, 301 F.2d 639.

30. This case with its multi-count, multi-party, complicated issues, both ultimate and subsidiary, of state and federal statutory and constitutional law presents again an ideal situation for the flexible device of a general charge with special interrogatories under F. R. Civ. P. 49. We have frequently urged District Courts to use this effective mechanism. See, e. g., Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 1962 AMC 951,

or the like. Thus, for example, the commencement and prosecution of unfounded criminal prosecution might under certain circumstances constitute, not only malicious prosecution under the state law (see Part IV), but a violation of Civil Rights as well.[31] Since the matter is not directly before us, we ought not to explore fully what those facts must be or what legal principles will be finally controlling. We may assume for our present purposes, however, that since we are dealing here with rights protected either by federal statute or the Constitution, there is no purpose to make every state criminal prosecution which ends in an acquittal automatically a violation of Federal Civil Rights Statutes. There must be something more. And the added elements may well partake substantially of traditional general tort law to bring in elements akin to want of probable cause, or malice, or both.[32] If that is so, then the federal claim may turn at times upon personal motivation and certainly the conduct of the particular officer-defendant as the actor. The trial Court must therefore take pains that all of these issues are appropriately submitted.

██ One way of meeting this problem—although certainly not the exclusive way—is to apply a "conspiracy" concept. Presumably that is what the Plaintiffs did here. In the Plaintiffs' complaint and in the pretrial order outlining the issues for the trial then to be held, F.R. Civ.P. 16, the Plaintiffs asserted the theory of a conspiracy among the several police officers and city officials to violate their Civil Rights. Of course, for a claim under § 1983, a conspiracy as such is not an indispensable element as it is under § 1985. But it may be charged as the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act.[33] Conspiracy is asserted in that situation on more or less traditional principles of agency, partnership, joint venture, and the like.

For the reasons previously set out, the conspiracy theory was not needed as to the initial false arrest and imprisonment; and, as to that phase the retrial of the Civil Rights count will in effect be limited to damages, compensatory and punitive. As to other actions violating Civil Rights, the "conspiracy" aspect will be for jury submission unless the facts compel a direction one way or the other.

## VI.

We turn now to the admissibility of the evidence of prior racial strife. (Part II).

██ By the comments made both in Parts IV and V involving either the concept of probable cause or those akin to it, and the element of malice, we necessarily recognize that a considerable latitude must be allowed to the trial Judge in the receipt of evidence bearing upon those factors. Likewise, in fixing punitive damages for false imprisonment (Part III), or malicious prosecution (Part IV), evidence bearing on good faith would be admissible.[34] But this has to do with facts and circumstances surrounding the incident giving rise to the arrest, the imprisonment, or the criminal prosecution making up the subject matter of the damage suit. Thus, a wide discretion must necessarily be invested in the trial Judge as to events occurring on that day (and the following

note 7, cert. denied, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55; Smoot v. State Farm Mut. Auto Ins. Co., 5 Cir., 1962, 299 F.2d 525, 533, and the numerous cases there cited. See also note 22, supra, as to probable cause.

31. See Cohen v. Norris, 9 Cir., 1962, 300 F.2d 24, 28, note 3.

32. See Mueller v. Powell, 8 Cir., 1953, 203 F.2d 797.

33. See Lewis v. Brautigam, 5 Cir., 1955, 227 F.2d 124, 128, 55 A.L.R.2d 505; Hoffman v. Halden, 9 Cir., 1959, 268 F.2d 280, 292; Cohen v. Norris, 9 Cir., 1962, 300 F.2d 24, 27.

34. In malicious prosecution, evidence of good faith may bear directly on liability through the essential element of malice. But so far as damages are concerned, the same rule would apply as to false imprisonment. See note 14, supra.

day when the criminal prosecutions were formally commenced).

But what took place a month before can have no bearing at all in determining whether the act of white people eating with Negroes in a public restaurant in Montgomery constitutes any kind of crime whatsoever. If this were admissible, then there would have been little reason not to include evidence of the physical brutality and violence growing out of the Freedom Riders in Alabama, Mississippi, and other Southern states, see Bailey v. Patterson (3-Judge Court), S.D.Miss., 1961, 199 F.Supp. 595; reversed 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512; the violence which had occurred a few years before in the Montgomery bus strike, Gayle v. Browder, D.C.Ala. (3-Judge), 142 F.Supp. 707, affirmed, 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114; or for that matter any historic episodes out of which these strong emotions arise.

■■■ On issues of probable cause or analogous concepts, malice and for aggravation, mitigation or extenuation of punitive damages, great latitude must be allowed. This extends not only to the events and circumstances but to the subjective apprehensions and beliefs held by the actors as well. But it must be confined reasonably to the transactions under judicial review and not loosely expanded to encompass previous, separate, disconnected incidents or occurrences.

The Court erred in the admission of this evidence and this error permeates all counts.

## VII.

■■■ As to the defendant Eiland, we think the trial Judge acted properly in granting his motion for directed verdict. On the day in which the arrests were made, Eiland was acting in his capacity as Desk Captain. He received a call to the effect that trouble might be brewing, and, as was customary, he assigned an officer to investigate. Up to that point he infringed none of the rights of the Plaintiffs. The next day, Eiland, again acting as Desk Captain, issued the warrants against the Plaintiffs here. These were issued on the basis of affidavits signed by Alford, an experienced police officer. While it may be that the affidavits or the manner of their verification was faulty, we think that in contrast to the officers (and their superiors) initiating the prosecution, Captain Eiland was acting in the role of a Magistrate. His function was to determine whether legal grounds existed for an arrest and prosecution.[35] At least on this present record we think he had quasi judicial immunity. Lewis v. Brautigam, 5 Cir., 1955, 227 F.2d 124, 128, 55 A.L.R.2d 505; Kenney v. Fox, 6 Cir., 1956, 232 F.2d 288; Tate v. Arnold, 8 Cir., 1955, 223 F.2d 782; Cawley v. Warren, 7 Cir., 1954, 216 F.2d 74.

The judgments in favor of the Defendants (other than Eiland) are therefore reversed and the causes are remanded to the District Court for further and not inconsistent proceedings.

Reversed and remanded.

CAMERON, Circuit Judge (dissenting).

### I.

In my judgment, the conclusions reached by the majority in the brilliantly written opinion are unsound fundamentally, because the major legal premise upon which they are based is false.

(a) That premise is that what the Nesmiths were doing at the time of their arrest was entirely legal on the ground that First and Fourteenth Amendment rights are absolute. About half way through its opinion, in reversing the lower court's judgment on the first count based upon false arrest, and in holding as a matter of law that the Nesmiths were entitled to recover thereunder, this erroneous claim is epitomized by the majority in these words:

"We may credit the concern which these police officers testified they

---

35. See Mr. Justice Jackson's celebrated exposition of the high importance of such actions. Johnson v. United States, 1948, 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436, 440.

felt. * * * But liberty is at an end if a police officer may without warrant arrest, not the person threatening violence, but those who are its likely victims merely because the person arrested is engaging in conduct which, though peaceful and legally and constitutionally protected, is deemed offensive and provocative to settled social customs and practices. When that day comes, freedom of the press, freedom of assembly, freedom of speech, freedom of religion will all be imperiled. For the exercise of each must then conform to what the conscientious policeman regards the community's threshold of intolerance to be. Consequently, as to this count, the judgment is reversed and rendered as to liability * * *."

The constantly repeated assertion that, as a matter of law, the Nesmiths could not be arrested for their actions is, therefore, based upon an assumption which runs exactly counter to the holdings of the Supreme Court. The rule still recognized by the Supreme Court was thus stated in Breard v. Alexandria, 1951, 341 U.S. 622, 642, 71 S.Ct. 920, 932–933, 95 L.Ed. 1233:

"The First and Fourteenth Amendments have never been treated as absolutes. Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. Rights other than those of the advocates are involved. By adjustment of rights, we can have both full liberty of expression and an orderly life." [1]

Breard has never been questioned by the Supreme Court, but, on the other hand, has been cited by it as authority for the quoted proposition a half dozen

times. For example, the non-absolute character of First Amendment rights is recognized in Roth v. United States (Mr. Justice Brennan, 1957), 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498, and in Konigsberg v. State Bar of California et al. (Mr. Justice Harlan, 1961), 366 U.S. 36, 50, 81 S.Ct. 997, 6 L.Ed.2d 105.

The Supreme Court, speaking through Mr. Justice Douglas, had a short time before, Terminiello v. Chicago, 1949, 337 U.S. 1, 4, 69 S.Ct. 894, 895–896, 93 L.Ed. 1131, while extolling freedom of speech as the most vital of all freedoms, stated: "That is why freedom of speech, though not absolute, Chaplinsky v. New Hampshire [315 U.S. 568], supra, pp. 571–572 [62 S.Ct. 766, 86 L.Ed. 1031], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger * * *." In Chaplinsky an unanimous court, speaking through Mr. Justice Murphy, had upheld the arrest of a member of Jehovah's Witnesses who had, on a public sidewalk in Syracuse, New York, accused a bystander of being a "damned racketeer" and a "damned fascist." The Supreme Court held that such utterances were "likely to provoke the average person to retaliation, and thereby cause a breach of the peace."

It is worth noting that the majority has not cited any authority which would clothe the conduct of the Nesmiths with any concept of "freedom of the press, freedom of assembly, freedom of speech, freedom of religion." Most cases dealing with "assembly" as encompassed within First Amendment rights relate to interference with the making of speeches on public streets, in public squares and the like by those who were attempting to draw a crowd in order to discuss public

1. Cited to this text in a footnote are Cantwell v. Connecticut, 310 U.S. 296, 303, 304, 60 S.Ct. 900, 84 L.Ed. 1213; Cox v. New Hampshire, 312 U.S. 569, 61 S. Ct. 762, 85 L.Ed. 1049; Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; Murdock v. Pennsylvania, 319 U.S. 105, 109–110, 63 S.Ct. 870, 87 L.Ed. 1292; Prince v. Massachu-setts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645; Saia v. New York, 334 U.S. 558, 561, 68 S.Ct. 1148, 92 L.Ed. 1574; Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295. The note also refers to the collection of cases in Niemotko v. Maryland, 340 U.S. 268, p. 276 ff, 71 S.Ct. 325, 95 L.Ed. 267.

questions and to convert the public to their way of thinking.[2]

Nothing like that was going on with the Nesmiths. According to the doctor, their trek to Montgomery was in order that they might acquire a "better understanding of the social structure" of the South, and might be advised about a bus boycott which had taken place there several years before, to study "the use of nonviolence as * * * a device of social change."

According to Chief Ruppenthal, on the other hand, during the forty-five minutes he was present with them in the Regal Cafe they were doing nothing more than having a social visit at the conclusion of their meal during which the white and Negro girls and boys were just carrying on, "laughing and going on like that."

Nobody connected with the arrest, imprisonment or prosecution of the Nesmiths had any knowledge of the asserted purpose or content of their discussions, and there was no disposition at all on the part of these defendants to interfere with any constitutional rights, actual or claimed. The officers merely found that a group of white people of both sexes and including students of college age were mingling socially with Negroes in the cafe; that their presence had drawn a crowd bent upon witnessing and possibly participating in the aftermath of this clear violation of long accepted social customs; and that, in the context of what was happening in Montgomery during the days immediately preceding this intermingling of the races, such conduct was calculated to produce a riot when the group emerged from the cafe. The officers were dedicated to the protection of the participants in the gathering from harm, and protecting the community they were employed to serve

from repetitions of violence and near violence which had ruled in Montgomery during the period.

(b) It is my opinion further that the majority has committed error in its appraisal of the law applying to the latter half of the syllogism upon which their conclusion is based. The quotation supra from its opinion assumes that a police officer may never, without warrant, arrest those engaged in the offensive and provocative conduct, but must under all circumstances turn upon the crowd threatening the violence. As far as I am advised there is no holding of the Supreme Court which supports this position. The pertinent portion of the ordinance of Montgomery under which the officers were acting is as follows:

> "It shall be unlawful for any person in the City to disturb the peace of others * * * by conduct calculated to provoke a breach of the peace."

This ordinance is a substantial rescript of a portion of what is known as the crime of common law breach of the peace.

The commonly accepted definition of this phase of breach of the peace is thus stated in § 116 of the A.L.I.Restatement of the Law of Torts: "A breach of the peace is a public offense done by violence or *one causing or likely to cause an immediate disturbance of public order.*" [Emphasis supplied.] As accepted by the Supreme Court, the rule is stated in Feiner v. New York, 1951, 340 U.S. 315, 320, 71 S.Ct. 303, 306, 95 L.Ed. 295:[3]

> "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but *acts and words likely to produce violence*

2. Cf. the language of Mr. Justice Douglas dissenting in Feiner, 340 U.S. at 330–331, 71 S.Ct. 311–312, 95 L.Ed. 295:

"Public assemblies and public speech occupy an important role in American life. One high function of the police is to protect these lawful gatherings so that the speakers may exercise their constitutional

rights. When unpopular causes are sponsored from the public platform, there will commonly be mutterings and unrest and heckling from the crowd. * * * "

3. Quoting from Cantwell v. Connecticut, 1940, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213.

*in others.* * * * When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." [Emphasis added.]

The importance of Feiner in the recognition of the permissible limitations of breach of peace laws justifies a close examination of its facts and its holding. The statute of the State of New York under which the arrest was made is set out in the margin.[4] Feiner was addressing an open air meeting at a street corner in Syracuse, New York, and the police received a telephone complaint. They found a crowd of about seventy-five or eighty people, both Negro and white, filling the sidewalk and spreading out into the street. Feiner was standing on a large wooden box, and the purpose of his speech was to urge his listeners to attend a meeting to be held that night in a hotel. He made derogatory remarks concerning the President of the United States, the American Legion, the Mayor of Syracuse and other local officials. In addition (340 U.S. pp. 317–318, 71 S.Ct. p. 305, 95 L.Ed. 295):

"He gave the impression that he was endeavoring to arouse the Negro people against the whites, urging that they rise up in arms and fight for equal rights. The statements * * * 'stirred up a little excitement.' Some of the onlookers made remarks to the police about their inability to handle the crowd and at least one threatened violence if the police did not act. There were others who appeared to be favoring petitioner's arguments. *Because of the feeling that existed in the crowd both for and against the speaker,*

the officers finally 'stepped in to prevent it from resulting in a fight.'" [Emphasis added.]

In affirming the arrest and conviction of Feiner, the Supreme Court uses language which is, in my opinion, binding upon this Court in the decision of this case:

"The trial judge heard testimony supporting and contradicting the judgment of the police officers that a clear danger of disorder was threatened. After weighing this contradictory evidence, the trial judge reached the conclusion that the police officers were justified in taking action to *prevent a breach of the peace.* The exercise of the police officers' proper discretionary power to prevent a breach of the peace was thus approved by the trial court and later by two courts on review. * * * *They found that the officers in making the arrest were motivated solely by a proper concern for the preservation of order and protection* of the general welfare, and that there was no evidence which could lend color to a claim that the acts of the police *were a cover for suppression of petitioner's views and opinions.* Petitioner was thus neither arrested nor convicted for the making or the content of his speech. *Rather, it was the reaction which it actually engendered."* [340 U.S. pp. 319–320, 71 S. Ct. pp. 305–306, 95 L.Ed. 295. Emphasis added.]

On the same day that Feiner was decided, the Supreme Court rendered decisions in two more cases applying the due process clause of the Fourteenth Amendment to First Amendment rights.[5] Mr. Justice Frankfurter, concurring in the result of Niemotko, Kunz and Feiner, took occasion, by making comparisons be-

---

4. "Any person who with intent to provoke a breach of the peace, or *whereby a breach of the peace may be* occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:

"1. Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior;

"2. *Acts in such a manner as to annoy,* disturb, interfere with, obstruct, *or be offensive to others; * * *."* [Emphasis added.]

5. Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267, and Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280.

tween the facts and the law involved in the three cases and by analysis of a number of other similar cases, to delineate the sometimes infinitesimal differences between the facts and the consequent principles of law arising from those facts. Certain language used by him has a peculiar applicability to the facts of the case before us and to the majority opinion, which in my judgment disregards principles so carefully spelled out in the series of cases:[6]

"This Court has often emphasized that in the exercise of our authority over State court decisions, the Due Process Clause must not be construed in an abstract and doctrinaire way by *disregarding local conditions.* \* \* \*

"Where conduct is within the allowable limits of free speech, *the police are peace officers for the speaker as well as for his hearers. But the power effectively to preserve order cannot be displaced by giving a speaker complete immunity.* \* \* \* *It is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker.* \* \* \*

"Enforcement of these statutes calls for public tolerance and intelligent police administration. \* \*" [Emphasis added.]

Feiner was recognized as valid by the recent decision of the Supreme Court in Speiser v. Randall:[7]

"Moreover, since only considerations of the greatest urgency can justify restrictions on speech, and *since the validity of a restraint on speech in each case depends on careful analysis of the particular cir-*

*cumstances,* cf. Dennis v. United States, supra [341 U.S. 494, 71 S. Ct. 857, 95 L.Ed. 1137]; Whitney v. California, supra [333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840], the procedures by which the facts of the case are adjudicated are of special importance and the validity of the restraint may turn on the safeguards which they afford. Compare Kunz v. New York, 340 U.S. 290 [71 S.Ct. 312, 95 L.Ed. 280], with Feiner v. New York, 340 U.S. 315 [71 S.Ct. 303, 95 L.Ed. 295]." [8]

Feiner was also recognized as authority in Garner et al. v. Louisiana, 1961, 368 U.S. 157, 174, note 27, 82 S.Ct. 248, 7 L.Ed.2d 207, and in Edwards et al. v. South Carolina, 1963, 372 U.S. 229, 236, 83 S.Ct. 680, 9 L.Ed.2d 697. It should be noted in passing that Edwards et al. had been prosecuted and convicted of the common law crime of breach of the peace. The opinion does not suggest that such a crime is not punishable where the evidence is sufficient.

(c) Certainly the cases cited in the majority opinion [9] do not stand for the basic holding of the majority that First Amendment rights are absolute, and that officers of the law cannot arrest the person whose conduct is calculated to incite the crowd to violence, but must, instead, proceed against the crowd whatever its size and temper. In each case the Supreme Court assumed the validity of statute making it unlawful for persons to engage in conduct calculated to provoke a breach of the peace, that is, "likely to produce violence in others." Also, in each instance, it found that the conduct upon which the parties were arrested had not engendered, and was not likely to engender, such a feeling in the crowd as would likely lead to violence;

6. 340 U.S. at pp. 288–289, 71 S.Ct. at pp. 336–337, 95 L.Ed. 267.

7. 1958, 357 U.S. 513, 521, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460, an opinion by Mr. Justice Brennan in which there was no dissent.

8. The Supreme Court had reversed a conviction of Kunz who had spoken without a permit and after a permit to speak had been refused. The conviction of Feiner had been affirmed, as shown supra.

9. Thompson v. Louisville, 1960, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654; Garner v. Louisiana, supra; Taylor v. Louisiana, 1962, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed. 2d 395; and Edwards v. South Carolina, supra.

and that a breach of the peace would not likely be occasioned by the expressions or the conduct involved; in short, that the officers were not, *under the evidence adduced,* justified in taking action to "prevent a breach of the peace." These cases recognize what those discussed above have held, that a balance must be struck in every case between the right of the individual to engage in the course of action in question as weighed against the rights of the public to live in an atmosphere of peace and tranquility. "By adjustments of rights, we can have both full liberty of expression and an orderly life."

It was the duty of the court below and is our duty, therefore, to weigh the conduct of the Nesmiths in the light of the circumstances then prevailing and determine whether the officers, with all of the facts before them, were justified in arresting and prosecuting the Nesmiths because it was their reasoned judgment that this conduct was calculated to provoke a disturbance of the public order or violence on the part of others at the time when the Nesmith group should leave the restaurant and become subject to the feelings of the crowd waiting outside the restaurant.

(d) I think this whole question and every facet of it depended upon the facts presented before the trial court and the jury. The judge who tried the case was reared in the State of Alabama and was acquainted with ᴏ conditions existing there. The jury also was composed of members of the public who knew the local conditions. The jury and the court necessarily found that "the officers in making the arrest were motivated solely by a proper concern for the preservation of order and the protection of the general welfare," and that their acts were not "a cover for suppression of [the Nesmiths'] views and opinions" or their freedom of association. It is manifest also that the jury and the court below

found that the actions of the Nesmith group were "likely to cause an immediate disturbance of public order," or were calculated to "produce violence in others," or were likely to engender a reaction in the crowd waiting outside, which justified their arresting the Nesmiths "to prevent a breach of the peace." I think that the record discloses ample facts to require that, under applicable law, the finding of the jury and the action of the court below be affirmed.

## II.

In approaching this question of whether there was sufficient evidence to support the jury's verdict, I think we could not do better than give ear to certain generally accepted remarks of Mr. Justice Jackson: [10]

"If any two subjects are intrinsically incendiary and divisive, they are race and religion. Racial fears and hatreds have been at the root of the most terrible riots that have disgraced American civilization. They are ugly possibilities that overhang every great American city. * * *

"Addressing himself to the subject, 'Authority and the Individual,' one of the keenest philosophers of our time observes: 'The problem, like all those with which we are concerned, is one of balance; too little liberty brings stagnation, and too much brings chaos.' (Russell, Authority and the Individual, 25.) Perhaps it is the fever of our times that inclines the Court today to favor chaos."

And then we must consider Tamiami,[11] where we took judicial notice that the mere fact that a Negro was riding on the same seat of a bus with an apparently white woman was calculated to produce a breach of the peace. Reverend Bullock, a Negro clergyman, was riding on an interstate bus sitting on the same seat with his wife whose color was white

10. Dissenting in Kunz v. New York, 1950, 340 U.S. 290, 313–314, 71 S.Ct. 312, 324–325, 95 L.Ed. 280.

11. Bullock v. Tamiami Trail Tours, 1958, N.D.Fla., 162 F.Supp. 203, reversed and rendered by this Court, 1959, 266 F.2d 326.

though she, too, was Negro. Citizens of Jamaica, they had learned of the decision of the Supreme Court in the School Segregation Cases, and assumed that segregation was not practiced on buses. They took their seats near the front. When the bus reached its first stop a passenger complained of this action, and the driver communicated this complaint to the Bullocks and asked them to move to the rear. They declined.

As the bus was at the point of departure from Perry, Florida, a new passenger entered and demanded of the Bullocks that they move to the rear. Upon their refusal, he assaulted both Reverend Bullock and his wife. In a civil action for damages filed by them, the district judge, sitting without jury, rejected the contention of the Bullocks "that because of the attitude of the South towards integration carriers of passengers should anticipate assaults and adopt measures to protect passengers therefrom." The district judge held (162 F.Supp. 205):

> "The evidence in the case completely refutes the contention of plaintiffs in this regard. Integration in transportation has now been in effect in Florida and elsewhere in the South for approximately four years and the undisputed evidence in this case is to the effect that * * * this is the only case in which an unprovoked assault of this nature has occurred."

In reversing his judgment denying recovery, this Court said:

> "* * * it is logical to infer that the drivers knew that the Bullocks were not experienced with 'southern tradition.' * * *
>
> "Furthermore, this Court will take judicial notice (as the district court should have done) of the commonly and generally known fact that the folkways prevalent in Taylor County, Florida, * ∴ * would cause a reasonable man, familiar with local customs, *to anticipate that violence might result if a Negro man and a seemingly white woman should ride into the county seated together toward the front of an interurban bus.*
>
> "* * * Tamiami * * * should have instructed its agency in Jamaica to advise Negroes applying for passage *through the southern part of the United States of the South's tradition of segregation.* It should have instructed its driver to advise Negroes who were obviously foreigners, * * * of segregation customs. * * *" [Emphasis added. 266 F.2d 331–332.] [12]

Certainly the action of the Nesmiths in taking their group into a Negro restaurant and dining with Negroes behind drawn Venetian blinds would be more calculated to lead to a breach of the peace than what was done by the Bullocks. If it is of any importance, surely a court would know that a teacher of Sociology in Illinois was acquainted with southern traditions; and, in my opinion, his assumed naivete was sufficient justification for the jury to look with doubt upon all of his testimony.

Following Tamiami, the court below would have been required to know judicially that what the Nesmiths did "would be calculated to produce violence." Everybody in the private dining room was bound to have been conscious of the presence of the police officers and of their actions in clearing the assembled crowd out of the main dining room on several occasions.

What this Court did in Tamiami also, in my opinion, leads to a complete re-

---

12. The chief case cited by this Court as the basis for its holding on judicial notice was Goldsby v. Harpole, 5 Cir., 1959, 263 F.2d 71, 82. The fact that I would not have concurred in these cases vesting this appellate court with power to draw upon its storehouse of knowledge for all of the law and most of the crucial facts in deciding, from the court's knowledge alone, that certain facts existed as a matter of law, does not keep me from recognizing the character of the two cases as precedents.

jection of the majority's holding here that local conditions prevalent in Montgomery were not competent evidence to be placed before a jury called upon to decide the reasonableness of the police in their dealings with the Nesmiths. The judicial knowledge of the Court in Tamiami was, according to the opinion, derived from "southern tradition." That concept necessarily embraces a consideration of the War Between the States, the "Tragic Era," local conditions, and all other phenomena going to establish a tradition which would be of sufficient certitude to serve as the basis of a directed verdict.

## III.

The rejection by the majority of evidence of what was happening in Montgomery shortly before the Nesmiths' trek certainly amounts to treatment of the problem "in an abstract and doctrinaire way by disregarding local conditions * * * ;" and disregards the admonition of the Supreme Court, supra, that "each case depends on careful analysis of the particular circumstances." [13] In fact, it is, in my opinion, too clear for argument that the conduct of the Nesmiths would produce different repercussions upon the public in Kansas, California, Hawaii and New York from those engendered in Alabama. It is equally clear that different reactions would ensue in Montgomery, Alabama on different dates.

At the time of the Nesmiths' visit, Montgomery was a powder keg, with the fuse prominently exposed for easy ignition. The proof shows that Regal Cafe was almost in the shadow of the Negro college which had been the focal point of riotous conduct in the immediate past.[14]

Reverend Martin Luther King was actively at work in the city. Relations between the races had become so strained that the Governor and the Attorney General of Alabama had made pleas to both white and colored people to refrain from agitation and violence. At one time several thousand Negroes had assembled near the steps of the Capitol and approximately ten thousand white people gathered in the immediate vicinity. An augmented force of city and county officers used fire hose to avoid a clash between the two groups. Some students were expelled from the Negro college, and pleas were issued by them calling upon the student body of every school in the nation to support the agitators.

The "nonviolence" begun several weeks before the Nesmiths' visit kept the community in an intermittent state of turmoil for several months and by the time this case was tried, the trial judge knew, from being present in Montgomery and from the cases appearing in his court, that Montgomery was the scene of one or more riots with the so-called "freedom riders." The federal government stationed about seven hundred United States Marshals in or near the city and fifteen hundred members of the Alabama National Guard were brought into the Montgomery area by the State of Alabama. Between four and five hundred State Highway Patrolmen, along with about seventy-five men from the Conservation Department of Alabama and other State agencies were brought in to assist in keeping order. These were joined by about four hundred sheriffs and deputies from over the state.

All of this was part and parcel of what was gathering heat at the time the doc-

13. The graphic words used by the Supreme Court approving an injunction against picketing is worth repeating here:
 "It must never be forgotten * * * that the Bill of Rights was the child of the Enlightenment. Back of the guarantee of free speech lay faith in the power of an appeal to reason by all the peaceful means for gaining access to the mind. * * * But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution." Milk Wagon Drivers' Union, etc. v. Meadowmoor Dairies, Inc., 1941, 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836.

14. See majority and dissenting opinions in Dixon v. Alabama State Board of Education et al, 5 Cir., 294 F.2d 150.

tor and his group were arrested. The City of Montgomery avoided major catastrophe only by the courage, the tolerance, the common sense and the firmness of the city and state officers. They stood guard as protectors of every man, woman and child within its limits, and without their protection nobody would have been safe regardless of his race, or color, or the office or status which he may have occupied.

The relevancy and importance of testimony concerning these conditions is to me beyond question and I am wholly unable to comprehend the attitude of the majority which rules it out.

Interestingly enough, this same panel of Judges sat in the consideration and decision of State of Alabama et al. v. United States of America, 5 Cir., 1962, 304 F.2d 583. The same majority as that here relied heavily upon testimony which, it seems to me, is of a character precisely similar to that rejected here.

That case involved the conduct of voter registrars in Alabama and the majority thought that the sequence of events preceding the registrar's actions then under scrutiny definitely colored the facts it was called upon to judge. It referred to actions of the registrars as far back as 1946. These quotations taken from 304 F.2d pages 585, 586 and 588–589 serve to illustrate this:

"What the Judge [Chief] ordered to be done must be measured in terms of what the Judge [Chief] saw. * * *

"And what was done likewise had to be measured against the manner in which it was done. The whole process was infected by an unsophisticated, patent, double standard. * * *

"Standing alone, and as irritating as that might be, this might sound quite trivial. But this was but a part of a pattern by which, * * * the grossest sort of inequality was being practiced. * * *

"From the lips of the two, the Judge could now see what others already knew, that the past was more than the past. It was the future as well. * * *

"It was in this setting—under the cumulative impact of gross abuses in the past and little expectation of improvement for the future—that the Judge was led to conclude * *."

The same character of evidence as that upon which the majority based its decision of that case is, in my opinion, not only relevant but necessary to the decision of this one. It being clear that the rights claimed by the Nesmiths are not absolute rights, but are such as are defined by the circumstances then existing, any evidence tending to establish the spirit with which the officers performed their official acts is of the essence of the problem.

It cannot be questioned that the parties tried the case below with full recognition that this is true. The pleadings of the Nesmiths abound in charges that the officers were not acting in good faith in what they did, but were carrying out a conspiracy to violate the plaintiffs' constitutional rights by subterfuge. Malice and want of probable cause constitute the base for their charges. The officers, on the other hand, defended on the ground that they were convinced from their recent and current experiences that the Nesmiths would be attacked by a portion of the crowd waiting outside the restaurant and defended by others, and that a breach of the peace was imminent. The definition of the issues by the pretrial order emphasized the same thing. Having consulted fully and obtained the advice of counsel, the officers proceeded in good faith to enforce Montgomery's ordinances. This was the issue framed by the pleadings, defined by the court, and now before this Court.

IV.

Much is said in the majority opinion about Alabama law dealing with false arrest and malicious prosecution. Neither of the cases relied upon nor the majority's discussion of them makes any clear distinction as to the principles of

law to be applied to the two. It seems certain that the count for malicious prosecution must be eliminated under the general law, which is followed in Alabama,[15] where, as here, it is undisputed that the action taken was under advice of counsel. The only unique rule which Alabama seems to follow as related to this case is that conviction in the Recorder's Court, although it raises a presumption that the arrest and imprisonment were proper, treats the presumption as a rebuttable one.

There is, to my mind, no doubt—and the majority seems to concede—that there was no proof by plaintiffs of malice, or ill will, or lack of probable cause on the part of the officers. It follows that the conviction in the Recorder's Court is a defense to these counts of the complaint. At all events, these questions were questions of fact for the jury's decision and the contentions upon which the majority bases its opinion have been foreclosed by the verdict of the jury approved by the trial court.

These considerations leave out of view the determinant fact that the civil rights count lies at the base of this whole proceeding and that the proof of the Nesmiths made out no case at all independent of their claims under the Constitution and 42 U.S.C.A. § 1983. This count was so intermingled with those assuming to proceed under Alabama law, both by the appellants and the court below and by the opinion of the majority, that no decision can be reached which does not take the complaint as a whole into account.

### V.

Under these circumstances, all that is said in the majority opinion about Alabama cases relating to the quantum of proof necessary to make a case against the officers is irrelevant. It is, in my opinion, settled in this circuit that the quantity and character of proof necessary to make out a case such as this is determined by federal law. This is peculiarly true here, where the whole case is bottomed on the assertion that the Nesmiths' civil rights were violated. One of the leading cases on the subject is Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443, 445:

"Appellants insist that, under the rule prevailing in the Alabama courts, a scintilla of evidence of negligence requires submission of the issue to the jury, and that since Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, a like rule should be required by the federal courts in diversity cases. Rules 38 and 39 of the Federal Rules of Civil Procedure provide for the kind of jury trial in federal courts that is preserved by the Seventh Amendment. * * *

"In determining whether there is sufficient evidence to take the case to the jury, a federal judge performs a judicial function and is not a mere automaton. * * * He must determine, 'not whether there is little or no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it.'"

That case has been followed consistently in this circuit, and the jury's decision in favor of appellees here is final.

The same is true of the majority's assertion that there is no dispute in the facts. As stated, I do not agree with this conclusion of the majority. I think the account given by Chief Ruppenthal and the other officers of what transpired in the cafe differs in material particulars from that given by Dr. Nesmith and his witnesses.

But, what is more important, the inferences reasonably to be drawn from the words which were spoken is the crucial thing to be considered. This Court's

---

15. 34 Am.Jur., Malicious Prosecution, § 71, page 747, citing the Alabama cases of Stewart v. Blair, 171 Ala. 147, 54 So. 506, and Kemp v. York, 16 Ala.App. 675,

81 So. 195, certiorari denied by Supreme Court of Alabama, 202 Ala. 425, 80 So. 809.

attitude, oft repeated, was well stated in Wright v. Paramount-Richards Theatres, Inc., 5 Cir., 1952, 198 F.2d 303, 307–308:

"'The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' * * * "

## VI.

The majority must, I submit, bridge a long gap beyond what the Supreme Court has held in order to justify the decision here rendered. With deference, I think the sense of balance so necessary to the proper functioning of this Republic has not been observed in its opinion. Much eloquence is employed in speaking of the right of the venturesome crusader from the North to challenge age-old social customs known by everybody to exist in Montgomery, Alabama. I think the eloquence could be better employed.

Consider the policeman called upon to decide between the constitutional rights of the individual and the protection of the public peace—I use Chief Ruppenthal as the example because he was the chief actor here. Thirty-one years of his life had been given to serving the public in this thankless position.[16] Nobody questions his standing in the community as a man of honor, integrity, courage and dedication to duty. He gave up his lunch when someone from the vicinity of Regal Cafe advised him over the telephone that a breach of the peace was in the making. (No Judge who is a member of the Court which has Tamiami as a precedent can doubt that such a danger was clear and present.)

He did not act hastily. He brought to bear the sanity, the tolerance, the sense of responsibility which experience had given him. He got the advice of his superior, who in turn consulted the lawyer. Nobody will question that he had to do something to save the situation from one of tragedy. His duty was marked out by the ordinances of the city he served. By following them for nearly a third of a century he had helped measurably to make the City of Montgomery safe to live in. He had adjusted rights so as to insure the liberty of the individual, but, above all, to provide for the community an orderly life. Such an adjustment had to be made here and the zone of decision was all gray.

The Code defined a breach of the peace as conduct calculated to provoke others to violence. He was faced with such conduct, which was a violation of the law of the municipality he had taken an oath to uphold. Under the law he had a right and a duty to arrest without warrant anyone guilty of conduct calculated to provoke a breach of the peace—a misdemeanor committed in his presence.

Are we to hold him and others like him to damages in a collateral civil action by reason of a choice he made in adjusting conflicting rights when that choice was honest and in good faith and had not been condemned by any statute or any court decision; will he have to lay his property on the line everytime he tries to forecast what a group of appellate judges will hold as to the correctness of that choice when they assemble at

16. "When constabulary duty's to be done * * * The policeman's lot is not a happy one." "The Pirates of Penzance," The Best Known Works of W. S. Gilbert, p. 93.

**138**

some far-off place at some future date? What will be the fate of society if the courts reduce such officers to a state of timidity?

In my judgment what the majority here holds does not keep the balance true. Stefanelli v. Minard, 342 U.S. 177, 72 S.Ct. 118, 96 L.Ed. 138. Chief Ruppenthal ordered the crowd on the sidewalk away on several occasions. He cleared out those who were watching from the vantage point of the main dining room on more than one occasion. He was not faced with a situation where he could ask the Nesmith group to leave. That would do no good. The leaving would create the moment of danger. I think his decision was a wise one and a fair one. I would commend him and the thousands like him in whose hands the safety of all the people rests. I respectfully dissent.