Virgil NORTON, Virgil Wesley and
James Chapman, Appellants,

v.

James P. McSHANE et al., Appellees.

No. 20722.

United States Court of Appeals
Fifth Circuit.

June 1, 1964.

Rehearing Denied July 15, 1964.

856

Hartwell Davis, Montgomery, Ala.,.
Richard H. Carlisle, Columbus, Miss.,.

Robert Varner, Montgomery, Ala., for appellants.

Sherman L. Cohn, Stephen B. Swartz, Attys., Dept. of Justice, John Douglas, Asst. Atty. Gen., Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for appellees.

Before RIVES, WISDOM and GEWIN, Circuit Judges.

RIVES, Circuit Judge:

This appeal consists of three essentially identical actions, consolidated for appeal, all of which seek actual and punitive damages for alleged deprivation of certain rights of the plaintiffs growing out of their arrest near Oxford, Mississippi, on October 1, 1962. The plaintiffs are Virgil Norton, Virgil Wesley, and James Chapman. Named as defendants are Nicholas de B. Katzenbach, Deputy Attorney General of the United States; James P. McShane, Chief of the Executive Office of the United States Marshals; John Doar, First Assistant to the Assistant Attorney General, Civil Rights Division; and William Tucker, Deputy United States Marshal. The suits were commenced in the Circuit Court of Lafayette County, Mississippi, and were removed to the United States District Court for the Northern District of Mississippi. See 28 U.S.C. § 1441(a), § 1442(a). Treating the defendants' motions to dismiss as motions for summary judgment, the district court held that all of the defendants were acting within the scope of their authority and are immune from the liability alleged in these suits. Its opinion is reported at 33 F.R.D. 131 (N. D.Miss.1963). Their complaints having been dismissed, the plaintiffs brought this appeal.

The plaintiffs allege that on October 1, 1962 (the day following the enrollment of James H. Meredith, a Negro, at the University of Mississippi) they were riding in an automobile on a highway approximately four miles east of Oxford, Mississippi, when the defendants unlawfully and maliciously arrested them without probable cause. The plaintiffs further allege that the defendants maliciously detained them without charges for twenty-one hours, during which time they were made to sit in a rigid position for eighteen hours without speaking, eating, or drinking. They allege that the defendants forced them to witness horrible and nauseating mistreatment of others, fingerprinted and "mugged" them, and subjected them "to all manner of vile abuse and mistreatment." Moreover, they allege that the defendants maliciously committed assault and battery on them with a large stick or billy club. Other counts allege a conspiracy by defendants to deprive plaintiffs of the equal protection of the laws and equal privileges and immunities under the laws and to prevent or hinder state authorities from giving them equal protection. The plaintiffs apparently are seeking relief under both common law and the Civil Rights Acts, 42 U.S.C. §§ 1983, 1985(3).

## I. Common Law.

Any case involving the doctrine of executive or official immunity requires the court to resolve a sharp conflict between two important considerations: the protection of the individual citizen against damage caused by oppressive or malicious action on the part of public officers, and the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits based on acts done in the exercise of their official responsibilities.[1]

As to judicial, legislative, and executive officers, the test to determine the existence of immunity from suits for monetary recovery based on allegedly wrongful conduct is whether or not the officers were acting within the scope of their authority or in the discharge of their duties. The controversy has cen-

1. Barr v. Matteo, 1959, 360 U.S. 564, 565, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Gregoire v. Biddle, 2 Cir. 1949, 177 F.2d 579, 581, cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363.

tered around how broadly "scope of authority" should be interpreted—i. e., would malicious acts be within the officers' scope of authority? Initially, the broadest interpretation of scope of authority was applied to judicial and legislative officers so as to protect them from civil suits to recover for actions taken by them in the exercise of their official functions, irrespective of the motives with which those acts were alleged to have been performed. By 1896 this broad interpretation had been carried over to heads of executive departments, provided the action had "more or less connection with the general matters committed by law to [their] control or supervision." Spalding v. Vilas, 1896, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780. After that time the doctrine of broad interpretation began to spread to subordinate officials, directly leading to the present state of the law.[2] The modern approach to official immunity is exemplified by Judge Learned Hand's opinion in Gregoire v. Biddle, 2 Cir.1949, 177 F.2d 579, cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363. Judge Hand's oft-quoted analysis is as follows:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as res nova, we should not hesitate to follow the path laid down in the books." 177 F.2d at 581.

This statement of the law is made binding on us by the express approval afforded it by the Supreme Court in Barr v. Matteo, 1959, 360 U.S. 564, 571–72, 79 S.Ct. 1335.[3] The Supreme Court clearly indicated that allegations of malice are not sufficient to prevent the application of executive immunity: "The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint * * *." 360 U.S. at 575, 79 S.Ct. at 1341. The

2. Excellent discussions of this history may be found in Gregoire v. Biddle, supra, n. 1; Papagianakis v. The Samos, 4 Cir. 1950, 186 F.2d 257, cert. denied, 341 U.S. 921, 71 S.Ct. 741, 95 L.Ed. 1354 (1951); Developments in the Law-Remedies Against the United States and Its Officials, 70 Harv.L.Rev. 827, 834–38 (1957).

3. Although Barr v. Matteo involved a suit based on defamation, the majority opinion clearly implies that the rules of law expressed therein apply to civil tort suits generally; and the opinion has been so construed in subsequent cases. See, e. g., Bershad v. Wood, 9 Cir. 1961, 290 F.2d 714, 719.

requirements that the act be within the outer perimeter of the line of duty is no doubt another way of stating that the act must have more or less connection with the general matters committed by law to the officer's control or supervision, and not be manifestly or palpably beyond his authority. See Spalding v. Vilas, supra at 498 of 161 U.S., 16 S.Ct. 631.

■ In Barr v. Matteo, supra, the Court also held that the rank of the officer, in itself, does not determine the applicability of the doctrine:

"We do not think that the principle announced in Vilas can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

"To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of *discretion*, it en-

tails. It is not the title of his office but the *duties* with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to 'matters committed by law to his control or supervision,' Spalding v. Vilas, supra, 161 U.S. at page 498, 16 S.Ct. at page 637—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits." 360 U.S. at 572–74, 79 S.Ct. at 1340, 1341. (Emphasis added.)[4]

■ There is another limiting factor —the nature of the duties. It is often said that the officer must be performing a "discretionary function." In Ove Gustavsson Contracting Co. v. Floete, 2 Cir.1962, 299 F.2d 655, cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050, Judge Medina explained what this requirement actually means:

"There is no litmus paper test to distinguish acts of discretion * *, and to require a finding of 'discretion' would merely postpone, for one step in the process of reasoning, the determination of the real question— is the act complained of the result of a judgment or decision which it is necessary that the Government official be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability?" 299 F.2d at 659.

■ The federal courts have applied the doctrine of official immunity to suits against numerous officials for many different torts.[5] By the great

4. "[S]ound policy would seem to place on level ground all official duties involving the exercise of judgment and discretion." Ove Gustavsson Contracting Co. v. Floete, 2 Cir. 1962, 299 F.2d 655, 659, cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050.

5. The following list of cases, although by no means exhaustive, gives some idea of the breadth of application of the doctrine: Barr v. Matteo, supra, note 1

(Acting Director of Office of Rent Stabilization—malicious defamation); Howard v. Lyons, 1959, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (Commander of Boston Naval Shipyard—defamation); Gregoire v. Biddle, supra, note 1 (Attorney General of the United States, Director of the Enemy Control Unit of the Department of Justice, District Director of Immigration—malicious arrest); Ove Gustavsson Contracting Co. v.

weight of authority, law enforcement officers are immune from civil suits based on allegedly malicious acts. See, e. g., Cooper v. O'Connor, 1938, 69 App.D.C. 100, 99 F.2d 135, 139, 118 A.L.R. 1440; Swanson v. Willis, D.Alaska 1953, 114 F.Supp. 434, aff'd per curiam, 220 F.2d 440 (9th Cir.); Laughlin v. Garnett, 1943, 78 U.S.App.D.C. 194, 138 F.2d 931; Hartline v. Clary, E.D.S.C.1956, 141 F. Supp. 151; Toscano v. Olesen, S.D.Cal. 1960, 189 F.Supp. 118. The case of Kozlowski v. Ferrara, S.D.N.Y.1954, 117 F. Supp. 650, stands alone among federal cases in holding that an FBI agent is not in a high enough position of responsibility to be entitled to immunity. That case would seem to be now controlled by Barr v. Matteo and Gustavsson.[6]

 Up to this time we have not referred to cases brought under the Civil Rights Acts, such as Lewis v. Brautigam, 5 Cir.1955, 227 F.2d 124, 55 A.L.R.2d 505. The question involved in these cases is the extent, if any, to which the Civil Rights Acts have abrogated the immunity doctrine. While it is clear that the common-law immunity afforded legislative[7] and judicial[8] officers applies in suits under the Civil Rights Acts, there remains much uncertainty as to the extent to which immunity for subordinate executive officials applies, if it applies

Floete, supra, note 4 (Contracting Officers of GSA); Papagianakis v. The Samos, supra, note 2 (Immigration Officials—false imprisonment); Cooper v. O'Connor, 1938, 69 App.D.C. 100, 99 F. 2d 135, 118 A.L.R. 1440 (FBI Agent, Comptroller of the Currency of the United States, United States Attorney, Assistant United States Attorney, etc. —malicious prosecution); Laughlin v. Rosenman, 1947, 82 U.S.App.D.C. 164, 163 F.2d 838 (President's Special Counsel, Attorney General, Special Assistant to the Attorney General, Director of Federal Prisons, Warden of Penitentiary— malicious prosecution); Brownfield v. Landon, 1962, 113 U.S.App.D.C. 248, 307 F.2d 389, cert. denied, 371 U.S. 924, 83 S.Ct. 291, 9 L.Ed.2d 232 (Air Force Inspector—defamation); Laughlin v. Garnett, 1943, 78 U.S.App.D.C. 194, 138 F.2d 931 (United States Attorney, Police Officer—malicious prosecution); Swanson v. Willis, D.Alaska, 1953, 114 F.Supp. 434, aff'd per curiam, 220 F.2d 440 (9 Cir.) (Deputy United States Marshal— battery, false arrest); Bershad v. Wood, supra, note 3 (Internal Revenue Service Officers); Waterman v. Nelson, 2 Cir. 1949, 177 F.2d 965 (Director Civil Service Region); Koch v. Zuieback, S.D. Cal.1961, 194 F.Supp. 651, aff'd, 9 Cir., 316 F.2d 1 (local draft board officials); Hartline v. Clary, E.D.S.C.1956, 141 F. Supp. 151 (Special Agents of Alcohol & Tobacco Tax Division—malicious assault); Gamage v. Peal, N.D.Cal.1963, 217 F.Supp. 384 (Air Force doctor); Toscano v. Olesen, S.D.Cal.1960, 189 F. Supp. 118 (Postal Inspector); Blitz v. Boog, 2 Cir. 1964, 328 F.2d 596 (Gov-

ernment psychiatrist—false imprisonment).

6. There is dicta in Hughes v. Johnson, 9 Cir. 1962, 305 F.2d 67, 70, that there is no immunity for an unlawful search and seizure. No authority was cited for that statement, and it would seem to be contrary to that court's holding in Bershad v. Wood, 9 Cir. 1961, 290 F.2d 714.

We do not consider as being in point such cases as Colpoys v. Foreman, 1947, 82 U.S.App.D.C. 349, 163 F.2d 908, and McVey v. Gross, N.D.Tex.1926, 11 F.2d 379, since they involved suits on a statutory bond. See 28 U.S.C. § 544(c); cf. Swanson v. Willis, supra n. 5, at 435, of 114 F.Supp. Likewise, Wilson v. Bittinger, 1958, 104 U.S.App.D.C. 403, 262 F.2d 714, was based on sections 11–735 and 11–724 of the D.C.Code.

The immunity to be afforded federal officers is governed by federal law. See Wheeldin v. Wheeler, 1963, 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605. In common law actions against state officers, such as in Nesmith v. Alford, 5 Cir. 1963, 318 F.2d 110, the doctrine of immunity is controlled by state law under Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. In Nesmith immunity was not raised as a defense except as to one quasi-judicial officer, who was in fact held to be immune.

7. See Tenney v. Brandhove, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019.

8. See, e. g., Kenney v. Fox, 6 Cir. 1956, 232 F.2d 288. The Nesmith case, supra n. 6, would seem to fit into this category.

at all.[9] In view of our conclusion later in this opinion that the instant suits are not within the purview of the Civil Rights Acts, we do not decide at this time the scope of official immunity under those statutes. We need only say that the doctrine may be given more limited application in those suits than it has been given at common law.

We are left to the hard choice of deciding whether the extremely aggravated wrongs as alleged in the complaint must remain unredressed because of the countervailing consideration of public policy expressed in Barr v. Matteo, supra, 360 U.S. at 576, 79 S.Ct. at 1342:

"To be sure, as with any rule of law which attempts to reconcile fundamentally antagonistic social policies, there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good." [10]

To make the court's choice less difficult, and to negative any charges that would 'lead to the conclusion that the acts of the defendants were beyond the outer perimeter of their line of duty, the defendants properly employed the modern procedure of offering testimony in support of their motions to dismiss treated as motions for summary judgment. Rules 12(c) and 56(e), Fed.R.Civ.P. The defendants offered the affidavit of Honorable Robert F. Kennedy, the Attorney General of the United States, that, at his direction, each of the defendants was in the performance of his official duties described in the affidavit, including the execution and enforcement of the orders of this Court and of the United States District Court for the Southern District of Mississippi. Mr. Kennedy's affidavit concluded:

"That at all relevant times and places set forth in the complaints in James Chapman v. James P. McShane, et al., Virgil Wealey (sic) v. James P. McShane, et al.; and Virgil Norton v. James P. McShane, et al., defendants Katzenbach, Doar, McShane and Tucker were discharging their official governmental responsibilities—Mr. Katzenbach as Deputy Attorney General and Mr. McShane as Chief of the Executive Office for United States Marshals and as a Deputy United States Marshal, Mr. Doar as an officer of the Department of Justice, and Mr. Tucker as a Deputy United States Marshal."

In the face of the Attorney General's affidavit, the plaintiffs cannot rest upon the mere allegations of their complaints unsupported by sworn testimony. It became incumbent on the plaintiffs, by affidavits or otherwise as provided in Rule 56, supra, to set forth specific facts showing that there was a genuine issue for trial as to whether the defendants were acting within the line and scope of their official duties. See Cunningham v. Securities Investment Company, 5 Cir.1960, 278 F.2d 600, 602, 603. The plaintiffs introduced no evidence whatever, and thus failed completely to meet the burden resting upon them.

In that state of the record, we must assume that to the extent the defendants allegedly acted overzealously

9. See generally, Note, The Doctrine of Official Immunity Under the Civil Rights Acts, 68 Harv.L.Rev. 1229 (1955); Comment, Civil Liability of Subordinate State Officials Under the Civil Rights Acts and the Doctrine of Official Immunity, 44 Calif.L.Rev. 887 (1956). The problem was first raised in Picking v. Pennsylvania R. R., 3 Cir. 1945, 151 F.2d 240, 250. It was discussed, but questionably resolved, in Hoffman v. Halden, 9 Cir. 1959, 268 F.2d 280, 298–300. See also, Rhodes v. Houston, D.Neb.1962, 202 F.

Supp. 624, 636, aff'd per curiam, 8 Cir., 309 F.2d 959, cert. denied, 372 U.S. 909, 83 S.Ct. 724, 9 L.Ed.2d 719.

10. Most writers agree that if the Federal Tort Claims Act were amended to allow such suits as the instant one to be brought against the United States, both policy interests would be served. See, e. g., Davis, Administrative Officers' Tort Liability, 55 Mich.L.Rev. 201 (1956); 3 Davis, Administrative Law Treatise, § 2607 (1958 ed. & 1963 Supp.).

or maliciously, they were nevertheless acting within the outer perimeter of their line of duty, and the alleged acts had more or less connection with the general matters committed by law to their control and supervision. Moreover, we are of the opinion that the selection of a proper method of enforcing a court's orders in the face of active opposition and obstruction is a decision which it is necessary that these officers be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability.

## II. The Civil Rights Act, 42 U.S.C. § 1983.

■■■■■ The plaintiffs assert that they have alleged a cause of action under 42 U.S.C. § 1983, which is a federal civil rights statute imposing civil liability on any "person who, under color of any statute, ordinance, regulation, custom, or usage, *of any State or Territory*" subjects anyone to the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." (Emphasis added.) Thus the person must be acting under color of *state* law for the section to apply, whereas the defendants in the instant suits were acting under color of *federal* law. As Judge Hand stated in the Gregoire case, "Section 43 [the precursor of § 1983] is so plainly limited to acts done under color of some state or territorial law or ordinance that no discussion can make it

clearer than appears from its reading." 177 F.2d at 581. Accord, Papagianakis v. The Samos, 4 Cir.1950, 186 F.2d 257, 262, cert. denied, 341 U.S. 921, 71 S.Ct. 741, 95 L.Ed. 1354 (1951); Swanson v. Willis, supra; Laughlin v. Rosenman, 1947, 82 U.S.App.D.C. 164, 163 F.2d 838, 843; cf. Wheeldin v. Wheeler, 1963, 373 U.S. 647, 650 n. 2, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605.[11] The new venue section, 28 U.S.C. § 1391(e), certainly does not expand the scope of coverage of 42 U.S.C. § 1938.[12]

## III. The Civil Rights Act, 42 U.S.C. § 1985(3).

■■■■ Plaintiffs allege a conspiracy to deprive them of equal protection of the laws and equal privileges and immunities under the laws and to prevent or hinder state authorities from giving them equal protection. Thus plaintiffs are trying to invoke 42 U.S.C. § 1985(3), which provides a right of action for damages,

"[i]f two or more persons in any State or Territory conspire * * * for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory

---

11. The criminal section, 18 U.S.C. § 242, however, applies to persons acting "under color of *any* law." (Emphasis added.) Because of section 1983's additional limitation to persons acting under color of state or territorial law, cases decided under the criminal section, such as Screws v. United States, 1944, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, and Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, are not relevant as to section 1983 even though they involve persons acting under color of federal law. See cases cited in text. The case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, involved section 1983, but the suit was against state officers acting under color of state law.

While the Court gave the same definition to "under color of" as was used in Screws, it did not extend the coverage of § 1983 to those acting under color of federal law.

12. The purpose of the new section was to make it possible to bring actions against government officials and agencies in district courts outside of the District of Columbia. It was intended that the new section "not create new liabilities or new causes of action against the U.S. Government" and "not give access to the Federal courts to an action which cannot now be brought against a Federal official in the U.S. District Court for the District of Columbia." S.Rep. No. 1992, 87th Cong., 2d Sess. (1962).

the equal protection of the laws
\* \* \*."

However, the facts alleged amount to malicious arrest and detention, assault and battery, and sundry deprivations of due process. To come within this statute, plaintiffs would have to allege facts amounting to intentional and purposeful discrimination to the plaintiffs individually or as members of a class. Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497. This the plaintiffs have not done. See Whittington v. Johnston, 5 Cir.1953, 201 F.2d 810, cert. denied, 346 U.S. 867, 74 S.Ct. 103, 98 L.Ed. 377; Dunn v. Gazzola, 1 Cir.1954, 216 F.2d 709, 711; Miles v. Armstrong, 7 Cir. 1953, 207 F.2d 284; Morgan v. Null, S.D.N.Y.1954, 120 F.Supp. 803.[13]

For the reasons stated herein the district court's dismissal of the three suits is

Affirmed.

GEWIN, Circuit Judge (dissenting):

This case does not involve the allegation of negligence on the part of federal officials and officers in the performance of their duties in undertaking to carry out orders of court. Rather the complaint charges the defendants with an *unlawful, willful* and *malicious* denial of fundamental constitutional rights, *without probable cause;* and facts which constitute the conduct alleged are set forth in the complaint. Accordingly, it is important to keep in mind that we are not considering mere negligent conduct, but complaints in which strong cases have been alleged, and if the allegations are supported by the facts, the constitutional rights of the plaintiffs have been ruthlessly violated without probable cause in an unlawful, willful and malicious manner.

Nothing herein said should be interpreted as giving any sanction or comfort to those who precipitated the problem which existed at the University of Mississippi at Oxford, Mississippi, on September 30, 1962. What I have to say relates more particularly to what I consider to be procedural errors and a misinterpretation of substantive law. I am deeply conscious of the fact that the defendants are high-ranking federal officials; but on the present state of the record we are not determining guilt or innocence, or the truth or falsity of the charges laid in the complaint. In my view the questions involved relate to whether the plaintiffs have stated a cause of action which entitles them to the right to present proof. Until all of the issues are resolved by a full and complete hearing, giving the plaintiffs the right to prove their case, I must respectfully dissent.

"The federal courts have applied the doctrine of official immunity to suits against numerous officials for many different torts. By the great weight of authority, law enforcement officers are immune from civil suits based on allegedly malicious acts." (Citing cases.)

The foregoing is a full paragraph from the majority opinion, except that it is stated therein that there is only one federal case which constitutes an exception to the rule. The quoted statement is not taken out of context. It forcefully demonstrates the failure of the majority to follow recent decisions of this Court to the effect that a litigant, civil or criminal, has an absolute right of freedom of speech—no matter how provocative—and assembly, under the first amendment to the Constitution without interference,[1] and when such rights are infringed, no matter how slight or how much in good faith, by a police officer, such officer is

13. Although we realize that there is some authority to the effect that 42 U.S.C. § 1985(c) applies only where some of the persons so conspiring acted under color of state law (see Koch v. Zueback, D.C.,

194 F.Supp. 651, 656–658, aff'd, 316 F.2d 1 (9 Cir. 1963)), we do not find it necessary to pass on that question.

1. Congress of Racial Equality v. Douglas, (1963 5th Cir.) 318 F.2d 95.

answerable in damages for such interference.[2] As a theoretical discourse on the doctrine of complete immunity, the majority opinion is brilliant. In my view, the opinion incorrectly states the law and misinterprets the procedural realities of the case.

The majority opinion is tied to three legal concepts: (a) the doctrine of immunity; (b) summary judgments; and (c) the assertion that the civil rights statutes apply only to state officials and, therefore, as to liability for civil damages, federal officers are uninhibited legally in their conduct with respect to the citizens of this country. These concepts will be discussed in the order mentioned.

The plaintiffs filed a civil suit against the defendants alleging that the defendants, individually and pursuant to a conspiracy, committed unlawful, malicious, forceful and violent conduct upon the plaintiffs at a time when the plaintiffs were lawfully proceeding down a public highway four miles distant from the small city of Oxford, Mississippi; that the plaintiffs were taken into custody against their will, and upon request the officers refused to advise them why they were being so taken; that they were placed in a crowded prison compound in a small building and compelled to sit with their hands locked around their knees, feet crossed, with eyes and head straight forward, back straight at all times; were denied food and drink, forbidden to speak or move, and in such position were compelled to witness horrible and nauseating mistreatment of other citizens; and were maliciously assaulted and battered with a large stick or "billy club." It is alleged that the plaintiffs

were so taken, confined and treated for a period of twenty-one hours; and that all of the foregoing acts were committed by the defendants without any reasonable or probable cause.[3] The majority has concluded that the acts just described constitute no violation of the civil law for which damages can be awarded, and that the defendants are insulated and protected from liability for civil damages by an impenetrable cloak of immunity. Such is the conclusion of the majority notwithstanding numerous cases by this Court and the Supreme Court pronouncing serious limits and powerful inhibitions upon law enforcement officers, even when they are dealing with known criminals. For example, the criminal must be informed of the charges against him and taken immediately to a magistrate;[4] he must be advised of his constitutional rights before he is permitted to speak about the crime with which he is charged; a person cannot be arrested without a lawful warrant unless the officer has probable cause;[5] and he is entitled to counsel immediately;[6] to mention only a few of the rights guaranteed to citizens and protected by the law, when officers are dealing with them.

If the holding of the majority is the law of the land, anyone who wears the badge of federal authority is licensed to commit all manner of evil against citizens with impunity, and the citizen must cower in fear and trembling, defenseless, and without a legal remedy. No redress can be sought, according to the majority, because such officers are immune and are not amenable to damages. Executive officers and all officers of the law are entitled to respect and obedience, but respect and obedience will soon fade

2. Nesmith v. Alford, (1963 5th Cir.) 318 F.2d 110.

3. In addition to the foregoing allegations, the plaintiff Chapman alleged:
"Plaintiff was also made ill by defendants taking from him and causing to be taken from him his medicine, that had been furnished him as a disabled veteran of World War II by the Veterans Administration to keep him from losing

consciousness, and that as a consequence he did lose consciousness."

4. Mallory v. United States, (1957) 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

5. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

6. Lee v. United States, (5th Cir. 1963) 322 F.2d 770.

away if officers of the federal government can engage in the conduct described with complete immunity. The best way to engender and gain respect is to give respect to others. In my view there could never be a situation, with the possible exception of war or revolution, which would give anyone, regardless of his badge of authority or the authority vested in him, the right to engage in the conduct of which the defendants have been accused. As said in one of the recent opinions of this Court, Nesmith v. Alford, 318 F.2d 110 (5th Cir.1963):

"[B]ut liberty is at an end if a police officer may without warrant arrest, not the person threatening violence, but those who are its likely victims merely because the person arrested is engaging in conduct which, though peaceful and legally and constitutionally protected, is deemed offensive and provocative to settled social customs and practices. When that day comes, freedom of the press, freedom of assembly, freedom of speech, freedom of religion will all be imperiled. For the exercise of each must then conform to what the conscientious policeman regards the community's threshold of intolerance to be. Consequently, as to this count, the judgment is reversed and rendered as to liability leaving open for a retrial the question of damages, compensatory and punitive."

## I

### Immunity

In the early history of this country in the famous case of Marbury v. Madison, 1 Cranch (U.S.) 137, 2 L.Ed. 60, involving a high-ranking officer—Secretary of State of the United States—Chief Justice Marshall, in speaking of high-ranking officials, said:

"Is it on account of the character of the person against whom the complaint is made? Is it to be contended that the heads of departments are not amenable to the laws of their country?

"Whatever the practice on particular occasions may be, the theory of this principle will certainly never be maintained. No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law. After stating that personal injury from the king to a subject is presumed to be impossible, Blackstone, vol. 3, p. 255, says, 'but injuries to the rights of property can scarcely be committed by the crown without the intervention of its officers; for whom the law, in matters of right, entertains no respect or delicacy; but furnishes various methods of detecting the errors and misconduct of those agents, by whom the king has been deceived and induced to do a temporary injustice.'"

The foregoing language has been approved by our Supreme Court in recent times, Bell v. Hood, (1946) 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, wherein Mr. Justice Black for the majority of the Court concluded:

"Moreover, where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."

The immunity doctrine which the majority pronounces is based upon the conception that the complaint in this case (as described in the opinion) is vindictive, ill-founded, vexatious, or fictitious. So classifying the complaint, the majority states that the Court is left to the " * * * hard choice" of deciding whether the extremely aggravated wrongs as alleged in the complaint must remain unredressed, because of the countervailing consideration of public policy expressed in Barr v. Matteo, 360 U.S.

564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). I can hardly concede that Barr v. Matteo establishes such a strong countervailing policy. In Barr v. Matteo the defendant who was head of a government agency was being sued for defamation by other government employees arising out of a dispute as to who was at fault for failure of the agency to meet certain congressional criticisms. It is fairly obvious from Matteo that the matters about which complaint was made resulted from " * * * the performance of acts *within the scope of official duties* * * *." As the majority opinion states in the case at bar, this suit is not founded on any such comparatively minor complaint. Here there is alleged (as stated in the majority opinion) " * * * a conspiracy by defendants to deprive plaintiffs of the equal protection of the laws and equal privileges and immunities under the laws and to prevent or hinder state authorities from giving them equal protection." Nice distinctions are not required to grasp the difference. I agree with the opinion of the Ninth Circuit in Hughes v. Johnson, 305 F.2d 67 (9th Cir. 1962). It was decided after Matteo and involved the question of immunity of officers who had abridged constitutional rights:

> "The question is whether a search without warrant and unsupported by arrest, in violation of the Fourth Amendment of the United States Constitution, can be said to fall within the scope of the official duties of these appellees. In our view, it cannot, and accordingly immunity does not extend to such conduct."

The majority opinion goes into great detail in its discussion of such phrases as "scope of authority"; "the outer perimeter" of the defendants' line of duty; the performance of "a discretionary function"; "discharge of duty" and "official functions." All of these loose and evasive terms are equated with each other to arrive at the conclusion " * * * that the act must have *more or less connection with the general matters committed by law to the officer's control or supervision,* and not be manifestly or palpably beyond his authority." [Emphasis added.] The short answer to the foregoing conclusion is that no officer can *unlawfully, willfully, maliciously* and *without probable cause*—all as alleged in the complaint—deny a citizen his *constitutional rights* and then claim that the acts involved " * * * have more or less connection with the general matters committed by law to the officer's control * * *." It is a paradox to say that an unlawful, willful and malicious violation of the United States Constitution has ever, by any decree or any other authority, been "committed by law" to the control or supervision of any officer, regardless of his rank or station in the government. At the very instant a violation of the Constitution is shown by willful, malicious and unlawful acts, support of the law is removed. Such willful, malicious and unlawful conduct in violation of the Constitution can never reach the "outer perimeter" of any authority; it cannot be within the "scope of authority," and no man is given "a discretionary function" which constitutes a license to violate the most fundamental law of all—the Constitution of the United States.

## II

### Summary Judgments

The majority opinion has treated this case as though we were considering a common law demurrer to a complaint.[7]

---

7. In this case there was a motion to dismiss the complaint supported by the affidavit of the Attorney General referred to in the opinion of the majority. The plaintiffs questioned the sufficiency of the motion to dismiss and the affidavit supporting it by filing a motion to strike in which motion, among other things, it is alleged that the plaintiffs' cause of action is based upon a violation of fundamental constitutional rights and that no court or executive official has authority to grant defendants immunity from liability for the violation of such rights; that there is no such immunity; that the acts were not committed in pursuance of any legal order of any court or official; that such acts could not be within the scope of

Both the Trial Court and the majority conclude that regardless of the allegations, the plaintiff should not be permitted an opportunity to make proof of the facts he alleges. This brings us to a consideration of summary judgments. There are certain well accepted and fundamental rules that apply to summary judgments long recognized by the courts, Fed.R.Civ.P. 56. Without undertaking to fully develop the subject, it is sufficient for our purposes here to summarize the rule. Summary judgments are granted sparingly; the moving party must clearly show that there is no genuine issue as to any material fact and that he is entitled to judgment in his favor as a matter of law. The record should clearly show what the truth is with respect to the matters complained about and it is not the purpose of the rule to deny litigants the right of trial if there is one single issue to try; the Court cannot decide factual issues but only whether there are factual issues to be decided; the probability of success of the party against whom the judgment is rendered and the fact that it is unlikely that he will prevail will not justify summary judgment action; the party seeking summary judgment has the burden of positively and clearly demonstrating that there is no issue of fact and any doubt as to the existence of such a fact issue is resolved against the movant. The moving party is not entitled to summary judgment as a matter of law even if he has technically discharged the burden resting on him; the exercise of

sound discretion does not apply in granting summary judgments, but such discretion applies only in denying motions for summary judgment; and the burden is heavy on the party who seeks such a judgment. National Screen Service Corp. v. Poster Exchange, Inc., (5th Cir. 1962) 305 F.2d 647; Wright on Federal Courts (1963) 385–389;[8] Summary Judgments, Asbill and Snell, 51 Mich.L.Rev. 1143.

The majority concludes that the affidavit of the Attorney General of the United States served "to make the Court's choice less difficult * * *" (meaning choice of a conclusion). The affidavit of the Attorney General was offered in support of the defendant's motion for summary judgment. We must examine the affidavit. The first noticeable defect about the affidavit is the fact that it nowhere states that the Attorney General made the affidavit based on his own personal knowledge as required by the rule. It does not state that the Attorney General was present at or near the scene four miles east of Oxford, Mississippi, when the acts complained about were committed. About the only factual statements contained in the affidavit are dates, the identity of the parties and the fact that the defendants were upon the campus of the University of Mississippi in the performance of their official duties and for the purpose of the removal of all obstructions of justice to insure that orders of the courts were executed and enforced. The majority anchors its conclusion to the statement by the Attorney General that the defendants "* * *

"official responsibility"; that it is not shown that the acts were committed under orders from the Attorney General; that such acts were not within the scope of the duties or authority of the defendants; and that it no where appears that the plaintiffs ever obstructed or attempted to obstruct any order of any court or official. The motion to dismiss was considered and treated as a motion for summary judgment under the provisions of Rule 12(c), Fed.R.Civ.P.

8. Professor Wright states the rule as follows:
"Finally, it is always true that, whether or not the non-moving party has sub-

mitted affidavits or similar material, the burden is on the moving party to establish that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. The moving party is not entitled to the benefit of favorable inferences to be drawn from his moving papers. Instead the matters presented in connection with the motion must be construed most favorably to the party opposing the motion. That it may be surmised that the non-moving party is unlikely to prevail at the trial is not sufficient to authorize summary judgment against him."

were discharging their official government responsibilities * * *" at all relevant times and places set forth in the complaint. Again the Attorney General does not state that he knows the facts, or was present, or saw the defendants in the performance of their duties, or what they did or were required to do in order to discharge their official governmental responsibilities and he referred to no document, law, instructions, or other authority which authorized the defendants to engage in the conduct of which they are accused. Briefly stated, so far as the issues in this case are concerned, the affidavit is innocuous, inconsistent, nonfactual and fails to meet the requirements of the rule dealing with summary judgments. Mercantile Nat. Bank at Dallas v. Franklin Life Ins. Co., (5th Cir. 1957) 248 F.2d 57; Alger v. United States, (5th Cir. 1958) 252 F.2d 519; Maddox v. Aetna Casualty and Surety Company, (5th Cir. 1958) 259 F.2d 51; Moore's Federal Practice (2nd ed.) Vol. 6, pages 2325–30. A case of interest is Howard v. Lyons, (1959) 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454, decided the same day as Barr v. Matteo. In that case a naval officer was being sued by a subordinate. The party being sued was a captain in the United States Navy and Commander of the Boston Naval Shipyard. The plaintiffs were officers of a federal employees association and were civilian employees at the Boston Naval Shipyard. The suit was over alleged defamatory matter which the Captain had forwarded to the Massachusetts congressional delegation. On motion for summary judgment the Captain and his commanding officer stated in affidavits that the sending of copies of the report in question to members of the congressional delegation was a part of the Captain's official duties and that under the regulations and instructions applicable he was bound to do the very thing about which he was being sued. The question before the Supreme Court was identical with the question now before us, that is, the sufficiency of an uncontradicted affidavit. The Court concluded as to the affidavits, more detailed and conclusive than the one here in issue, as follows:

"*Although of course such an averment by the defendant cannot foreclose the courts from examination of the question,* we think that the affidavit of petitioner's commanding officer, *and a Memorandum of Instructions* issued by the Secretary of the Navy which petitioner has with our leave filed in this Court, plainly show that the District Court was correct in finding that the circulation of the report to the Massachusetts congressional delegation was 'in the discharge of [petitioner's] * * * official duties and in relation to matters committed to him for determination.'" [Emphasis added.]

It is obvious that the Memorandum of Instructions issued supported the affidavit; and it is likewise evident that the affidavits standing alone could not foreclose the courts from an examination of the question involved. In this case it is impossible as a matter of law, for any person to produce any document, law, or other authority, which would justify the commission of the acts alleged to have been committed, or clothe the defendants with immunity. If true, the alleged acts constitute a gross violation of all law.

In my view, neither the Attorney General of the United States, nor any other person under our system of government, regardless of his position or rank, has any authority to approve the misconduct alleged by authorization, participation or ratification. The only theory upon which such conduct could be excused is the divine right of kings which presumes that personal injury from the king is impossible. Even under the doctrine of divine right, the king's helpers were not excused and as to them the law "entertains no respect or delicacy."

### III

### Civil Rights

By concluding that the Federal Civil Rights Statutes, 42 U.S.C.A. § 1983, apply only to persons who are acting under

color of *state law*, the majority concludes that since the defendants were acting under color of *federal law* they are exempted from all liability. It may be that the Civil Rights Statutes impose additional liability on persons acting under "color of law" but such statutes were never intended to grant exemptions and immunities to *state* or *federal* officers. These are not immunity statutes. The majority points to no authority, and my search fails to reveal any authority for sweeping away immunity of state police officers when they violate the civil rights of a plaintiff under the Constitution of the United States, but which grants immunity to federal officers who commit the same acts. The justification for granting immunity would certainly run in favor of the state official, for he is called on far more often to enforce the laws, ordinances, and regulations of city, county, state, and nation than are United States marshals or other federal officials. In this connection it seems appropriate to quote from our case of Lewis v. Brautigam, (5th Cir. 1955) 227 F.2d 124, 55 A.L.R.2d 505, a suit against two state deputy sheriffs, a sheriff, and state's attorney of the Eleventh Judicial Circuit of Florida:

> "The complaint should not be dismissed on motion unless, upon any theory, it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts that could be proved in support of his claim."

In discussing the exemption *vel non* of public officers from liability under the civil rights acts, because of the discretionary nature of their duties, Brautigam states:

> "We need not, however, explore that difficult and important field of law upon the present appeal, *further than to say that a quasi-judicial officer, such as a prosecuting attorney,*

> *who acts outside the scope of his jurisdiction and without authorization of law, cannot shelter himself from liability by the plea that he is acting under color of office.* Cooper v. O'Connor, 69 App.D.C. 100, 99 F.2d 135, 138, 118 A.L.R. 1440; 43 Am. Jur., Public Officers, § 277." [Emphasis added.]

The protection of life, liberty and due process, as well as affording the equal protection of the laws, are not *discretionary* governmental functions but are *constitutional guarantees*, whereby the United States has a duty to insure the protection of such rights. This is clearly shown in the case of Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429,[9] where Logan and others, United States marshals, were indicted under Sections 5508 and 5509 of the Revised Statutes (18 U.S.C. §§ 241, 242) for conspiracy to deprive persons of their civil rights, and for murder of citizens of the United States. The Supreme Court made the following ruling (144 U.S. 263, 283–284, 12 S.Ct. 617, 623, 36 L.Ed. 429, 436):

> "*The United States, having the absolute right to hold such prisoners, have an equal duty to protect them, while so held, against assault or injury from any quarter.* The existence of that duty on the part of the government necessarily implies a corresponding right of the prisoners to be so protected; and this right of the prisoners is a right secured to them by the constitution and laws of the United States.

> \* \* \* \* \*

> (144 U.S. 264, 294, 12 S.Ct. 617, 626, 36 L.Ed. 429, 440)

> "*In the case at bar the right in question does not depend upon any of the amendments to the constitution, but arises out of the creation and establishment by the constitution itself*

9. The decision of Logan v. U. S., 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, has lost none of its vitality but has been expanded under the Supreme Court's decisions in

Screws v. United States, 1944, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, and Monroe v. Pape, 1962, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

of a national government, para-
mount and supreme within its
sphere of action. Any government
which has power to indict, try, and
punish for crime, and to arrest the
accused, and hold them in safe-
keeping until trial, must have the
power and the duty to protect
against unlawful interference. its
prisoners so held, as well as its ex-
ecutive and judicial officers charged
with keeping and trying them.

* * * * *

(144 U.S. 264, 295, 12 S.Ct. 617, 627,
36. L.Ed. 429, 440)
"The United States are bound to
protect against lawless violence all
persons in their service or custody
in the courts of the administration
of justice. This duty and the cor-
relative right of protection are not
limited to the magistrates and offi-
cers charged with expounding and
executing the laws, but apply, with
at least equal force, to those held in
custody on accusation of crime, and
deprived of all means of self-
defense." [Emphasis added.]

The issue of whether the defendants
were acting within the "scope of em-
ployment" is not the only issue involved;
the question of whether they were acting
under "color of law" is also a vital one.
The Supreme Court, in the case of
Screws v. United States, 1944, 325 U.S.
91, 65 S.Ct. 1031, 89 L.Ed. 1495, was
wrestling with the constitutionality of
Section 20 of the Criminal Code, which
is presently 18 U.S.C. § 242, and which
section was originally derived from the
Revised Statutes §§ 5509 and 5510 which,
in turn, were part of the original Force
Acts of 1871, which civil counterparts,
enacted at the same time, are presently
the Civil Rights Act (42 U.S.C. §§ 1983
and 1985). Section 20 of the Criminal
Code was attacked as being too broad
and nebulous to set forth a standard of
guilt for a crime. The Supreme Court,
speaking through Mr. Justice Douglas,
held that the Court must in all instances
find the statute constitutional, if pos-
sible, and the Court would do so by a

narrow construction, holding that the
accused Negro in the custody of the
sheriff was denied his constitutional
right to due process of law, because the
accused was killed and thus not allowed
a criminal trial.

The Supreme Court, in addressing it-
self to the questions of what officials
were held guilty of violation of constitu-
tional rights under "color of law," held
as follows in Screws, 325 U.S. 91, 108, 65
S.Ct. 1031, 1039, 89 L.Ed. 1495, 1506:
"Some of the arguments which have
been advanced in support of the con-
trary conclusions suggest that the
question under § 20 is whether Con-
gress has made it a federal offense
for a state officer to violate the law
of his State. But there is no war-
rant for treating the question in
state law terms. The problem is not
whether state law has been violated
but whether an inhabitant of a State
has been deprived of a federal right
by one who acts under 'color of any
law.' He who acts under 'color' of
law may be a federal officer or a state
officer. He may act under 'color' of
federal law or of state law. The
statute does not come into play
merely because the federal law or
the state law under which the officer
purports to act is violated. It is
applicable when and only when some
one is deprived of a federal right by
that action. The fact that it is also
a violation of state law does not
make it any the less a federal offense
punishable as such. Nor does its
punishment by federal authority en-
croach on state authority or relieve
the state of its responsibility for
punishing state offenses." [Empha-
sis added.]

To reach the conclusion that federal of-
ficers are likewise responsible for acting
under "color of law," Mr. Justice Doug-
las relied upon the case of Logan v.
United States, supra.

In the case of Monroe v. Pape, supra,
365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492,
a Negro brought suit against the city of
Chicago, Illinois, and various policemen,

sheriffs, justices of the peace, states' attorney, and several John Doe state officers, under 42 U.S.C. § 1983, for invasion of his home, and subsequent search without a warrant, arrest and detention without a warrant and without arraignment. The United States District Court dismissed the suit on the ground that the complaint alleged no cause of action under 42 U.S.C. § 1983, or under the Federal Constitution because of the individual defendants' official capacity and common law immunity. The Supreme Court, speaking through Mr. Justice Douglas, reversed the lower court and held that the invasion of the home of the plaintiff without a search warrant, the arrest and detention without a warrant, and without arraignment, constituted deprivation of constitutional rights of the petitioner under 42 U.S.C. § 1983, as the police officials were acting under "color of law" and thus swept aside any defense of immunity. Mr. Justice Douglas, in reaching such conclusion on behalf of the United States Supreme Court, relied upon his previous decision in Screws v. United States, supra, 325 U.S. 91, 65 S. Ct. 1031, 89 L.Ed. 1495, and held that the same interpretation of acts under "color of law" under 18 U.S.C. §§ 241 and 242, applied with like force to 42 U.S.C. § 1983. Here is the language of the Court (365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505):

> "We conclude that the meaning given 'under color of' law in the Classic case [United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368] and in the Screws and Wil-

liams cases was the correct one; and we adhere to it.

"In the Screws case we dealt with the statute that imposed criminal penalties for acts 'wilfully' done. We construed that word in its setting to mean the doing of an act with a 'specific intent to deprive a person of a federal right.' 325 U.S. at 103 [65 S.Ct. at page 1036]. *We do not think that gloss should be placed on § 1979 (42 U.S.C.A. § 1983) which we have here.* The word 'wilfully' does not appear in § 1979. Moreover, § 1979 provides a civil remedy, while in the Screws case we dealt with a criminal law challenged on the ground of vagueness. Section 1979 *should be read against the background of tort liability that makes a man responsible* for the natural consequences of his actions." [Emphasis added.]

Aside from the civil rights statutes the doctrine of immunity has never been extended to exempt officers, state or federal, from liability in civil damages for the conduct charged in this case.[10] In my view, it would be far better for the plaintiffs and the defendants alike, to have the facts with reference to the charges alleged fully developed in order to determine what the truth is, rather than to stop the plaintiffs at the threshold, denying them the opportunity of proving what they allege, and not affording the defendants an opportunity to come forward with such proof as would establish their innocence.[11] Both plain-

---

10. The Life and Fire Ins. Co. of New York v. Adams, 9 Pet. 573, 9 L.Ed. 234 (1835); Cooper v. O'Connor, et al., (1938) 69 App.D.C. 100, 99 F.2d 135, 118 A.L.R. 1440, cert. den. 305 U.S. 642, 643, 59 S. Ct. 146, 83 L.Ed. 414; Wilson v. Bittinger, (1958) 104 U.S.App.D.C. 403, 262 F.2d 714; Colpoys v. Foreman (1947) 82 U.S.App.D.C. 349, 163 F.2d 908; McVey v. Gross, (D.C.N.D.Tex. 1926) 11 F.2d 379.

11. An interesting discussion of the doctrine of immunity may be found in the recent case of Wheeldin v. Wheeler, 373

U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605. In Wheeldin the Supreme Court concluded that the doctrine of immunity as set forth in Matteo did not apply where "* * * under the allegations of the complaint respondent * * * was not acting sufficiently within the scope of his authority to bring the doctrine into play." The Court of Appeals for the Ninth Circuit had applied the doctrine of immunity. Wheeldin v. Wheeler, 302 F.2d 36 (9th Cir. 1962). It also should be observed that under Wheeldin state law governs the cause of action. Removal is

tiffs and defendants should have their day in court.

ON PETITION FOR REHEARING

PER CURIAM:

A rehearing en banc not being ordered, no formal order is entered as to the en banc consideration requested by appellants. See Rule 25a, Fifth Circuit.

The appellants' petition for rehearing is

Denied.

permitted only because " * * * the interpretation of a federal defense makes the case one arising under the Constitution or laws of the United States." Citing cases. The case at bar is different from the Wheeldin case insofar as federal jurisdiction is concerned, because in Wheeldin the Court concluded "[i]n short, the facts alleged do not establish a violation of the Fourth Amendment." In the instant case, the facts alleged do establish a violation of fundamental constitutional rights.